[Cite as *State v. Mott*, 2020-Ohio-4979.]

COURT OF APPEALS
RICHLAND COUNTY, OHIO
FIFTH APPELLATE DISTRICT

|  |  | JUDGES: |
|---|---|---|
| STATE OF OHIO | : | Hon. William B. Hoffman, P.J. |
|  | : | Hon. W. Scott Gwin, J. |
| Plaintiff-Appellee | : | Hon. Craig R. Baldwin, J. |
|  | : |  |
| -vs- | : |  |
|  | : | Case No. 2019CA0116 |
| NOEL NATHANIEL MOTT | : |  |
|  | : |  |
| Defendant-Appellant | : | OPINION |


CHARACTER OF PROCEEDING:     Criminal appeal from the Richland County Court of Common Pleas, Case No. 2019CR0283

JUDGMENT:     Reversed and Remanded


DATE OF JUDGMENT ENTRY:     October 20, 2020


APPEARANCES:

For Plaintiff-Appellee            For Defendant-Appellant

JOE SNYDER                        FELICE HARRIS
Assistant Prosecutor             Harris Law Firm
Richland County                  6031 E. Main Street, #187
38 South Park St., 2nd Floor      Columbus, OH 43213
Mansfield, OH 44902

*Gwin, P.J.*

{¶1} Defendant-appellant Noel Nathaniel Mott ["Mott"] appeals his conviction and sentence after a jury trial in the Richland County Court of Common Pleas.

*Facts and procedural History*

{¶2} On March 22, 2019, Mott was indicted on one count of Illegal Use of Supplemental Nutrition or WIC Program Benefits in violation of R.C. 2913.46(B) & (D), a felony of the fifth degree. The Indictment alleged that on or about November 14, 2018 in Richland County, Ohio Mott knowingly possessed, bought, sold, used, altered, accepted, or transferred supplemental nutrition assistance program benefits, WIC program benefits, or any electronically transferred benefit in any manner not authorized by the Food and Nutrition Act of 2008 (7 U.S.C. 2011 et seq.) or Section 17 of the "Child Nutrition Act of 1966," 80 Stat. 885, 42 U.S.C. 1786 as amended in violation  R.C. 2913.46(B) & (D).

{¶3} On August 13, 2019, trial counsel filed a Motion to Suppress alleging Sergeant Morrow lacked reasonable suspicion for Mott's traffic stop.  However, trial counsel subsequently filed a motion to continue the suppression hearing on the grounds that,

 Mott has a matter in the Wood County, Ohio Court of Common Pleas, Case No. 18 CR 0587, before Judge Matthew Reger that consists of the identical facts and circumstances as the case at bar.  In the referenced case, a motion for suppression of evidence was filed on May 30, 2019. Currently, Judge Reger's Court has not rendered a decision on the merits of Mott's suppression motion.

As the Wood County motion was filed first, Mott submits that the suppression motion, and motion to continue filed herein are moot and should be dismissed without prejudice.

Docket Entry 24. On September 19, 2019, the trial court filed a Judgment Entry that granted Mott's motion to withdraw his previously filed motion to suppression and tolled time until "the decision in Case No. 18CR0587 of the Wood County Court of Common Pleas has been rendered." Docket Entry 25. On November 5, 2019, the trial court filed a Judgment Entry to Remove the Stay noting that the Wood County Court of Common Pleas had denied the motion to suppress that had been filed in that case. Docket Entry 31. The court removed the stay and left the matter set for a jury trial on November 12, 2019.

{¶4} A jury trial commenced on November 12, 2019.

{¶5} Susan Baker ("Baker") works in the Investigative Unit of the State Highway Patrol. She investigates food stamp violations and testified, generally, that Ohio Direction Card (SNAP) funds are based on household income and are for household member use. Money is added monthly to the Ohio Direction Card which is used like a debit card and accessed with a PIN code.

{¶6} Baker testified that on November 14, 2018, Miranda Hamilton sent a text to Mott's cell phone, and approximately nine other cell phones, reading: "Hey, tryna see about getting rid of some my food card. There 205 on it. I ain't got no cigs and could use some cash." Approximately two hours later, Ms. Hamilton sent a second text, "So seeing if anyone wants what I didn't use." One minute later, a text from Mott's phone replied, "I'm on Brickman." Hamilton responded, "On my way." (T. at 191-193). At 7:41 p.m. the next

day, November 15, 2018, Mott purportedly texted, "I need the code, lol." Ms. Hamilton responded with the pin code required to use her Ohio Direction (SNAP) Card. (T. at 194-195; State's Ex. 7). On November 15, 2018, around 8:00 p.m. Ms. Hamilton's Direction (SNAP) Card was used in transactions totaling approximately $153.00 at two separate markets in the state of Michigan, (T. at. 205; State's Exhibit 10; State's Exhibit 11). The state conceded that Mott did not use the cards. T. at 242. Miranda Hamilton asserted her Fifth Amendment rights and declined to testify during Mott's jury trial. T. at 226.

{¶7} Shortly after 11:15 pm on November 15, 2018, Sergeant Shane Morrow ("Morrow") of the State Highway Patrol noticed Mott's vehicle travelling southbound on I-280 in Wood County, Ohio because it was travelling only 58 miles per hour in a 65 mile per hour zone. As Mott's vehicle passed, Morrow noticed the rear brake lights remained lit. Morrow, therefore, decided to follow Mott's vehicle. Mott exited the highway and Morrow initiated a traffic stop for an equipment violation. Mott was asked for his license and was identified as Noel Mott, 42, of 220 S. Adams Street in Mansfield, Ohio. There was a female passenger, identified as Donjion Reese ("Reese"), 17, of Mansfield, Ohio. Mott explained that he was not the owner of the vehicle that he was driving; however he had permission to use the car. Sergeant Morrow then called for backup and United States Border Patrol Agent Lalon and Trooper Lawson arrived on scene to assist. T. at 172. Trooper Lawson stayed with Reese while Sergeant Morrow and Agent Lalon searched the vehicle.

{¶8} During the search of the vehicle, a black bag on the rear seat, was found. In the black bag, two Ohio Direction (SNAP) cards were found and taken into evidence. One of the cards belonged to a Miranda Hamilton, the other belonged to a Marshea Frank-

Smith.   Two cell phones were seized, one from Reese. The second cell phone was acknowledged by Mott as belonging to him. T. at 174 – 175.

{¶9}    A search warrant for the phones was obtained by METRICH Drug Task Force for the contents of Reece's and Mott's phones. On November 28, 2018, Sergeant Morrow picked up the two cell phones and a copy of a CD disc, which contained the extracted information for each cell phone. Baker received a Samsung Galaxy S9 cell phone from Ohio State Highway Patrol Sergeant Shane Morrow on December 13, 2018 which contained information indicating it belonged to Mott.

{¶10}  Baker testified that to the November 14 and 15, 2018 texts between Hamilton and Mott.  Baker also identified five texts.  The first outgoing text to "Canesha" read, "I need to come get girl card from you." (T. at 198).  Over objection, the state requested and Baker gave her interpretation of the text. (T. at. 198-200). Baker further identified a sent text to "Donji' reading, "Let me know how much she spent off the card." The next text to Donji read, "I was bout to go to Wal-Mart to get that game, but I'll wait on you. Bring food card too." (T. at 201). The third text to "Donji" read, "Didn't want my babe hungry, and the stamp card is there too." (T. at 202) Finally, Baker read an incoming text from an unnamed person: "I'm at Wal-Mart getting groceries. My friend gave me her food card, so as soon as I get home call you, okay? Won't be too much longer." (T. at 202).

{¶11}  Baker further testified that a person with a card that has money on it that wants drugs, could give it and the PIN number to someone else — in exchange for drugs or money. (T. at 203).  The state then introduced a text exchange between Hamilton and Mott from July 3, 2018 wherein Hamilton texts, "I need some smoke. I got 10." Mott replies,

"Smoke in." (T. at 203-204). Baker also testified Mr. Mott lived on Brickman Ave. in Mansfield, Richland County, OH. (Tr. at 191-193; State's Ex. 8).

{¶12} During closing argument, the state admitted that Mott did not use the card; rather, two women used Miranda Hamilton's card in Michigan. (T. at 242). The state reiterated that that Mott did not use the card; rather, two women used Miranda Hamilton's card in Michigan in response to a juror's request to, "Say that again." (Id.).

{¶13} At the conclusion of the evidence, the state requested that the jury be given an instruction on aiding and abetting. T. at 211. The trial court instructed the jury on aiding and abetting with respect to the sole count of the Indictment. T. at 235.

{¶14} On November 13, 2019, Mott was found guilty as charged. The same day, the court sentenced Mott to twelve months in prison with two days of jail time credit and three years discretionary post-release control.

*Assignments of Error*

{¶15} Mott raises five Assignments of Error,

{¶16} "I. NOEL MOTT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL AS A RESULT OF THE STATE'S INTRODUCTION OF UNFAIRLY PREJUDICIAL TESTIMONY AND PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT.

{¶17} "II. THE TRIAL COURT COMMITTED PLAIN ERROR WHEN IT ADMITTED OTHER ACTS EVIDENCE.

{¶18} "III. NOEL MOTT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE UNITED STATES AND OHIO CONSTITUTIONS.

{¶19} "IV. NOEL MOTT WAS DENIED HIS CONSTITUTIONAL RIGHT TO A FAIR TRIAL AS A RESULT OF THE CUMULATIVE ERRORS AT TRIAL.

{¶20} "V. THE TRIAL COURT INCORRECTLY CALCULATED NOEL MOTT'S JAIL TIME CREDIT."

I.

{¶21} In his First Assignment of Error, Mott asserts that the state denied him a fair trial by introducing unfairly prejudicial testimony[1] and allowing prosecutorial misconduct during closing argument.

**Standard of Appellate Review – Plain Error.**

{¶22} Because Mott did not object to the prosecutor's closing argument in the trial court our review is limited to the Plain Error standard of review.

{¶23} As the United States Supreme Court observed in *Puckett v. United States* (2009), 556 U.S. 129, 134,129 S.Ct. 1423, 1428, 173 L.Ed.2d 266,

> If an error is not properly preserved, appellate-court authority to remedy the error (by reversing the judgment, for example, or ordering a new trial) is strictly circumscribed. There is good reason for this; anyone familiar with the work of courts understands that errors are a constant in the trial process, that most do not much matter, and that a reflexive inclination by appellate courts to reverse because of unpreserved error would be fatal.

(Internal quotation marks and citations omitted).

{¶24} [A]n appellate court may, in its discretion, correct an error not raised at trial only where the appellant demonstrates that (1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's

---

[1] Mott asserts the statements as inadmissible in his Second Assignment of Error. Accordingly, we will address Mott's concern with the statements in our disposition of his Second Assignment of Error.

substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[s] the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus* 560 U.S. 258, 262, 130 S.Ct. 2159, 176 L.Ed.2d 1012 (2010).    (Internal quotation marks and citations omitted).  The Ohio Supreme Court has defined the ability of a court to reverse a conviction because of structural error,

We have previously held that if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other constitutional[l] errors that may have occurred are subject to harmless-error analysis.  *State v. Hill* (2001), 92 Ohio St.3d 191, 197, 749 N.E.2d 274, *quoting Rose v. Clark* (1986), 478 U.S. 570, 579, 106 S.Ct. 3101, 92 L.Ed.2d 460.  Moreover, as we stated in *State v. Perry*, 101 Ohio St.3d 118, 2004–Ohio–297, 802 N.E.2d 643, [c]onsistent with the presumption that errors are not structural, the United States Supreme Court ha[s] found an error to be structural, and thus subject to automatic reversal, only in a very limited class of cases. *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997) (*citing Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (complete denial of counsel)); Tumey *v. Ohio*, 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749 (1927) (biased trial judge);  *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination in selection of grand jury);  *McKaskle v. Wiggins,* 465 U.S. 168, 104 S.Ct. 944, 79 L.Ed.2d 122 (1984) (denial of self-representation at trial);  *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81

L.Ed.2d 31(1984) (denial of public trial); *Sullivan v. Louisiana*, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (defective reasonable-doubt instruction).

*State v. Wamsley*, 117 Ohio St.3d 388, 2008-Ohio-1195, 884 N.E.2d 45, ¶ 16. [Citations and internal quotation marks omitted].

{¶25} The Ohio Supreme Court pertinently addressed when structural error analysis should be used in *State v. Perry*, supra:

We emphasize that both this court and the United States Supreme Court have cautioned against applying a structural-error analysis where, as here, the case would be otherwise governed by Crim.R. 52(B) because the defendant did not raise the error in the trial court. *See Hill*, 92 Ohio St.3d at 199, 749 N.E.2d 274; *Johnson*, 520 U.S. at 466, 117 S.Ct. 1544, 137 L.Ed.2d 718. This caution is born of sound policy. For to hold that an error is structural even when the defendant does not bring the error to the attention of the trial court would be to encourage defendants to remain silent at trial only later to raise the error on appeal where the conviction would be automatically reversed. We believe that our holdings should foster rather than thwart judicial economy by providing incentives (and not disincentives) for the defendant to raise all errors in the trial court-where, in many cases, such errors can be easily corrected.

101 Ohio St.3d at 124, 802 N.E.2d at 649, 2004–Ohio–297 at ¶ 23.

{¶26} Thus, the defendant bears the burden of demonstrating that a plain error affected his substantial rights and, in addition that the error seriously affect[s] the fairness,

integrity or public reputation of judicial proceedings.  *United States v. Olano*, 507 U.S. at 725,734, 113 S.Ct. 1770(1993); *State v. Perry*, 101 Ohio St.3d 118, 120 802 N.E.2d 643, 646(2004).  Even if the defendant satisfies this burden, an appellate court has discretion to disregard the error.  *State v. Barnes*, 94 Ohio St.3d 21, 27, 759 N.E.2d 1240(2002); State *v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804(1978), paragraph three of the syllabus; Perry*, supra*, at 118, 802 N.E.2d at 646.

***Issue for Appellate Review:***  *Whether the prosecutor's remarks during closing argument affected Mott's substantial rights and seriously affected the fairness, integrity, or public reputation of the judicial proceedings.*

{¶27}  Allegations of prosecutorial misconduct implicate due process concerns, and the touchstone of the analysis is the "'fairness of the trial, not the culpability of the prosecutor.'" *State v. Newton*, 108 Ohio St.3d 13, 2006-Ohio-81, 840 N.E.2d 593, ¶ 92, *quoting Smith v. Phillips*, 455 U.S. 209, 219, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982).

If any misconduct occurred, the court must consider the effect it had on the jury "in the context of the entire trial."  *State v. Keenan*, 66 Ohio St.3d 402, 410, 613 N.E.2d 203 (1993).  With regard to each allegation of misconduct, we must determine whether the conduct was "improper, and, if so, whether [it] prejudicially affected substantial rights of the defendant."  *State v. Smith*, 14 Ohio St.3d 13, 14, 470 N.E.2d 883 (1984).  "[A] defendant's substantial rights cannot be prejudiced when the remaining evidence, standing alone, is so overwhelming that it constitutes defendant's guilt, and the outcome of the case would have been the same regardless of evidence admitted erroneously." *State v. Hicks*, 194 Ohio App.3d 743, 2011-Ohio-3578, 957 N.E.2d 866, ¶ 30

(8th Dist. 2011), *citing State v. Williams*, 38 Ohio St.3d 346, 349–350, 528 N.E.2d 910 (1988).

*State v. Mammone,* 139 Ohio St.3d 467, 2014-Ohio-1942, 13 N.E.3d 1051, ¶ 109.

**{¶28}** Whether statements made by a prosecutor amount to misconduct and whether such statements render a trial fundamentally unfair are mixed questions of law and fact, which we review de novo. *United States v. Carson*, 560 F.3d 566, 574 (6th Cir. 2009 (*citing United States v. Francis*, 170 F.3d 546, 549 (6th Cir.1999) (*citing United States v. Clark*, 982 F.2d 965, 968 (6th Cir.1993)).

**{¶29}** A prosecutor is entitled to a certain degree of latitude in closing arguments. *State v. Liberatore*, 69 Ohio St.2d 583, 589, 433 N.E.2d 561(1982). Thus, it falls within the sound discretion of the trial court to determine the propriety of these arguments. *State v. Maurer*, 15 Ohio St.3d 239, 269, 473 N.E.2d 768(1984). A conviction will be reversed only where it is clear beyond a reasonable doubt that, absent the prosecutor's comments, the jury would not have found the defendant guilty. *State v. Benge*, 75 Ohio St.3d 136, 141, 1996-Ohio-227. Furthermore, "[i]solated comments by a prosecutor are not to be taken out of context and given their most damaging meaning." *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S.Ct. 1868, 40 L.Ed.2d 431(1974).

**{¶30}** Mott cites the following statements as improper,

But I also think that, we touched on some of it, that it's admitted in the texts that are in there, there were some of them you could see, it is kind of a sad situation, but, I mean, these cards are essentially the currency of the poor, and they can be exploited, and I think that's what has happened here. And you heard Ms. Baker. What happens to these things? People

in bad situations, like Ms. Hamilton, whether knowingly or willingly or wantonly, sell what's supposed to be used for something good for be it drugs or smoke or whatever was in those texts that he was giving out.

The most important thing is knowingly. I think when you view those texts, when you go over the content of those texts, this is essentially a system. You saw it on there. The texts blasted out to like ten people, "The smoke's in." I hope I don't need to tell you what "the smoke's in" means. And multiple references to different people about getting cards, bringing cards, transferring cards, paying for cards. That's what this is and that's what this code section is designed to prevent and punish and stop, to stop the abuse of the system and this money being used for things it was never meant to be used for and by people like the defendant that it was never meant to be used by.

T. at 243-244.

{¶31} Miranda Hamilton declined to testify at trial asserting her Fifth Amendment rights. T. at 226[2]. The state cites to no evidence in the record that Miranda Hamilton exchanged an Ohio Direction (SNAP) card for drugs. The state cites to no evidence in the record that Mott accepted an Ohio Direction (SNAP) card in exchange for drugs. The text exchange clearly shows Mott did not solicit Miranda Hamilton to sell or exchange her Ohio Direction (SNAP) card; rather, Miranda Hamilton sent out a text to nearly ten people offering to exchange the card for *money*. Further, the Ohio Direction (SNAP) card can only

---

[2] In fact, R.C. 2913.46(B) prohibits the transfer of SNAP benefits in any manner not authorized by the law. Thus, Ms. Hamilton could be charged with the same offense that Mott was charged with in this case.

be used to purchase approved items; it cannot be indiscriminately used to purchase contraband, cigarettes, or alcohol. In her text message Miranda Hamilton is asking for money because, "I ain't got no cigs and could use some cash." T. at 191-193. In addition, the text message concerning "smoke in" was sent in July 2018 some four months *before* Miranda Hamilton sent the text message offering to sell her Ohio Direction (SNAP) card for *cash*. T. 203-204.

{¶32} The statements made by the prosecutor were therefore an improper suggestion that Mott deals in drugs and accepts Ohio Direction (SNAP) cards as payments when there record contains no competent, credible evidence to support that statement.

{¶33} We do find that the prosecutor's statements regarding Mott's alleged sale or exchange of drugs was irrelevant and improper. In our disposition of Motts Second Assignment of Error, we find the "smoke in" text message was not admissible for any purpose under Evid.R. 404(B) and the purported rational relied upon by the court either invited an improper character reference or was irrelevant to a material issue in the case.

II.

{¶34} In his Second Assignment of Error, Mott argues that the trial court committed error by admitting text messages under the "other acts" exception to the hearsay rule.

**Standard of Appellate Review.**

{¶35} "[A] trial court is vested with broad discretion in determining the admissibility of evidence in any particular case, so long as such discretion is exercised in line with the rules of procedure and evidence." *Rigby v. Lake Cty.*, 58 Ohio St.3d 269, 271, 569 N.E.2d 1056 (1991).

*Issue for Appellate Review: Whether the admission of texts messages under the "other acts" exception to the hearsay rule was an abuse of discretion.*

{¶36} Evid.R. 404(A) provides that evidence of a person's character is not admissible to prove the person acted in conformity with that character. Evid.R. 404(B) sets forth an exception to the general rule against admitting evidence of a person's other bad acts. The Rule states as follows: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

{¶37} Recently, the Ohio Supreme Court clarified the standard under which a prosecutor may introduce evidence of a defendant's prior bad acts in a trial for a new crime. In *State v. Hartman,* Oh.Sup.Ct. No. 2019-0184, 2020-Ohio-4440, 2020 WL 5637596 (Sept. 22, 2020), the Court affirmed the Eight District Court of Appeals decision overturning the rape conviction of Hartman for allegedly assaulting a female acquaintance in her hotel room after they had spent the evening out with a group of friends.[3] *Hartman,* ¶1. Hartman claimed the hotel encounter was consensual. *Hartman, ¶8.* To counter his claim and support its version of events, the state presented "other acts" evidence that Hartman had sexually abused his stepdaughter when she was a child.

{¶38} Prior to trial Hartman's counsel attempted to exclude the "other acts" evidence as too distinct from the case on trial so that it had no probative value. *Hartman,*

---

[3] We recognize that the decision in *Hartman* was issued after the decision by the trial court in Mott's case, and after briefs were filed in this Court. However, *Hartman* does not change the law; rather, *Hartman* simply clarifies existing law and precedents.

¶12. The state argued that both assaults had occurred while the victims were sleeping and that this amounted to a "behavioral fingerprint" identifying Hartman as the perpetrator. The state further asserted that the evidence was probative of Hartman's "motive, intent, plan or scheme and absence of mistake." *Hartman, ¶12.* The state contended that the fact that Hartman had molested his stepdaughter while she was sleeping provided evidence that Hartman's motive for returning to the hotel room was to assault the victim in the current case. Id. In the alternative, the state argued that the evidence rebutted any "mistaken impression that this was consensual sexual activity". Id.

{¶39} In rejecting the state's arguments, the Ohio Supreme Court first noted, that "other acts evidence must be relevant not to the ultimate determination of guilt, but to *the particular purpose for which it is offered.*" *Hartman,* ¶26 (emphasis added). The Court cautioned, "Trial courts must keep in mind that it is not enough to say that the evidence is relevant to a nonpropensity purpose. The nonpropensity purpose for which the evidence is offered must go to *a "material" issue that is actually in dispute between the parties.*" Id. at ¶27 (emphasis added)(citations omitted). The trial court must in every case weigh the probative value and the danger of unfair prejudice under Evid.R. 404(B). Id. at ¶29. Further, if the trial court decides the evidence is admissible, it must take steps to minimize the risks of unfair prejudice by explaining and instructing the jury the specific purpose for which the evidence may be considered and the rational for its admission. This must be done on the record. *Hartman,* ¶34.

{¶40} In rejecting the state's "modius operandi" argument for the admission of the prior acts, the Court noted,

Here, B.T.'s testimony did not provide evidence of a modus operandi. There is nothing fingerprint-like about molesting a child in a bed during the night. Nor do the circumstances of the child molestation in this case contain any idiosyncratic features also present during the alleged rape. That both crimes were committed against a female sleeping in a bed is hardly unique to Hartman as a perpetrator.

Furthermore, as the court of appeals correctly noted, *identity was not an issue at trial.* This is an acquaintance-rape case. E.W. knew who Hartman was before the assault. And during opening statements, Hartman's attorney made clear that the theory of the defense was that the sexual encounter between Hartman and E.W. had been consensual. *Thus, even if B.T.'s testimony could have been labeled modus operandi evidence, it still would not have been admissible because identity was not an issue in this case.*

*Hartman,* ¶38 (emphasis added).  The Court further rejected the state's arguments that the evidence was admissible to show a common scheme or plan. The Court noted that many litigants mistakenly use the concepts of "modus operandi" and common scheme or plan largely synonymously. *Hartman*, ¶40.  The Supreme Court noted,

[T]hese two sometimes permissible uses of other-acts evidence are distinct concepts. The utility of modus operandi evidence comes from its connection with the current crime through shared characteristics that make the conduct unique to the perpetrator. In contrast, plan evidence need not share any common characteristics with the current crime; rather, the other

acts are linked to the present crime because they are carried out in furtherance of the same overall plan. Evidence of a plan or common design "refers to a larger criminal scheme of which the crime charged is only a portion." *Barbour,* 106 Ill. App.3d at 999, 62 Ill. Dec. 641, 436 N.E.2d 667.

Thus, while modus operandi evidence is "most useful in showing that the accused is the perpetrator of the crime charged," id., evidence of a common design will more often be relevant to show the motive for the crime charged, see McCormick, Evidence, Section 190, at 448-449 (2d Ed.1972). Common-plan evidence generally concerns events that are "inextricably related" to the crime charged. Weissenberger at Section 404:18; Curry, 43 Ohio St.2d at 73, 330 N.E.2d 720. The other acts form the "immediate background" of the present crime: they are typically either part of the "same transaction" as the crime for which the defendant is on trial or they are part of "a sequence of events" leading up to the commission of the crime in question. Weissenberger at Section 404:18. As one authority has explained, this type of other-acts evidence is admitted

> [t]o prove the existence of a larger, continuing plan, scheme, or conspiracy, of which the present crime on trial is a part. This will be relevant as showing motive, and hence the doing of the criminal act, the identity of the actor, and his intention, where any of these is in dispute.

McCormick at 448-449. Thus, plan evidence generally supports one of the following possible conclusions: "(1) the occurrence of the act in issue; (2)

the identity of the person who committed the act; or (3) the existence of the required mental state in the actor." Leonard at Section 9.1.

A defendant's plan might be demonstrated through evidence of "prior preparatory acts," such as the prior theft of an instrumentality used in the commission of the current crime. 1 Imwinkelried et al., Courtroom Criminal Evidence, at Section 907. For instance, in a prosecution for illegally manufacturing drugs under R.C. 2925.04, evidence that the defendant recently robbed a warehouse to steal a barrel of the ingredient methylamine could be admissible to show the defendant's scheme to produce methamphetamine. *See* "A No-Rough-Stuff-Type Deal," *Breaking Bad*, AMC (Mar. 9, 2008). Or consider a case in which the defendant is slated to inherit an estate if two other heirs are no longer living. See 1 Imwinkelried et al. at Section 907. In a trial for the murder of one heir, evidence showing that the defendant killed the other would not be admissible to demonstrate that he was a cold-blooded killer, but it could be admitted to show that he had a plan to kill the other heirs to attain the inheritance. See id.

Here, the evidence plainly does not fit into the common understanding of plan evidence. Hartman's alleged assault of his stepdaughter was not part of a larger scheme involving the rape of E.W.

*Hartman,* ¶40-44. Nor did the Court accept the state's contention that the evidence was admissible pursuant to *State v. Williams,* 134 Ohio St.3d 521, 2012-Ohio-5695, 983 N.E.2d 1278. The Ohio Supreme Court stated,

While the other-acts evidence in *Williams* tended to show that the defendant, who had been charged with the rape of a 14-year-old boy, had a pattern of grooming teenage boys to take advantage of them sexually, that fact alone is not what overcame the propensity bar. Rather, the result in *Williams* turned on the state's use of the other-acts evidence for the purpose of refuting the defendant's claims that he was not sexually attracted to teenage boys and establishing that the defendant had acted with the specific intent of achieving sexual gratification.  Id. at ¶ 22, 25.

*Hartman,* ¶45.  The Court further addressed the intent or absence of mistake component of Evid.R. 404,

To determine whether other-acts evidence is genuinely probative of the intent of the accused to commit the charged crime, rather than merely the accused's propensity to commit similar crimes, the question is whether, "*under the circumstances, the detailed facts* of the charged and uncharged offenses strongly suggest that an innocent explanation is implausible." (Emphasis in original.) Id. at Section 7.5.2. Or to put it another way, the other-acts evidence "must be so related to the crime charged in time or circumstances that evidence of the other acts is significantly useful in showing the defendant's intent in connection with the crime charged." 1 Wharton's Criminal Evidence at Section 4:31.

*Hartman*, ¶58.  The Court further found that the trial court's limiting instructions to the jury did not cure the prejudicial effect of the other acts evidence.

***"Other Acts" Evidence in this case.***

**{¶41}** In a prosecution for using, acquiring, etc., food stamps in any manner not authorized by statute or regulation, the government must prove that the defendant knew that his acquisition or possession of food stamps was in a manner unauthorized by statute or regulation.  As in any other criminal prosecution requiring mens rea, the government may prove by reference to facts and circumstances surrounding the case that defendant knew that his conduct was unauthorized or illegal.  *Liparota v. United States,* 471 U.S. 419, 422; 434 105 S.Ct. 2084, 85 L.Ed.2d 434(1985).  The mens rea requirement for R.C. 2913.46(B) is "knowingly." R.C. 2901.22(B) sets forth the definition of how and when a person acts knowingly,

**{¶42}** Whether a person acts knowingly can only be determined, absent a defendant's admission, from all the surrounding facts and circumstances, including the doing of the act itself."  *State v. Johnson*, 56 Ohio St.3d 35, 38,381 N.E.2d 637(1978) *citing State v. Huffman,* 131 Ohio St. 27, 1 N.E.2d 313(1936):  *State v. Rojas*, 64 Ohio St.3d 131, 139, 592 N.E.2d 1376(1992); *State v. Huff*, 145 Ohio App.3d 555, 563, 763 N.E.2d 695(1st Dist. 2001).  (Footnote omitted.)  Thus, "[t]he test for whether a defendant acted knowingly is a subjective one, but it is decided on objective criteria."  Id. *citing State v. Adams*, 4th Dist. Ross No. 94 CA 2041, 1995 WL 360247(June 8, 1995) and *State v. Paidousis*, 10th Dist. Franklin No. 00AP–118, 2001 WL 436079 (May 1, 2001).  *See also, State v. Butler*, 5th Dist. Holmes No. 2012–CA–7, 2012–Ohio–5030, ¶ 25.

**{¶43}** In the case at bar, Mott has cited to several instance where the state introduced "other acts" evidence.

### *June 3, 2018 text message from Miranda Hamilton.*

{¶44}  Mott first cites to the testimony of Susan Baker.  The state called a sidebar to introduce a June 2018 text to Mott wherein "Miranda [Hamilton] identifies that number as hers."  Defense counsel objected as the text was "too remote in time."  The court overruled the objection.  (T. at 187) Thereafter, the testimony was as follows:

> STATE:     Was that message sent on June 3, 2018?
>
> BAKER:     Yes.
>
> STATE:     And does it come in as an incoming message?
>
> BAKER:     Yes.
>
> STATE:     What does that message say?
>
> BAKER:     "Hey, it's Randa.  Whenever we go to leave, would you let me drive there so I can make at least 100 or something?  Trying to figure out how to make something before we leave, because we don't have a dollar to our name right now, and Tony gonna need diapers, just more cigs, food along the way.  Once we get there, you know, but if and you would or could do that, there is some stuff from the Dollar Store I wanted to get before you left if you don't care about that to just let me know.  Trying to figure out something out.  My dad was bullshitting me.  He just got paid, but probably all gone, and that's why he bullshitting."

T. at 188-189. Though the text message was five months before the event that is the subject of this proceeding, the Court allowed it to introduce the phone numbers of Mott and Miranda Hamilton.  T. at 187.  Miranda did not testify at trial.  No response from Mott to this message was presented by the state during the trial.

{¶45} The state's stated asserted purpose for presenting this text message to the jury was to show the phone number belonged to Miranda Hamilton. T. at 187. However, far more hearsay was admitted then necessary to fulfill the state's stated purpose. In addition, other means existed for the state to show the jury that the number belonged to Miranda Hamilton, such as testimony or records from the cell phone provider. The statements made in the text message are not relevant to any material issue that is actually in dispute in the case.

### *October 18, 2018 text message sent to Canesha.*

{¶46} The state introduced the following text messages,

STATE: So this would be a text from the defendant's phone?

BAKER: Correct.

STATE: And what is the text of that message?

BAKER: "I need to come get girl card from you."

T. at 197-198. Mott's counsel did object to this text; however, the trial court overruled the objection. This message was sent October 18, 2018; however, Miranda did not send it. T. at 197. The individual who received that text message, Canesha, did not testify at trial. No response to this text message was presented by the state. The state did not allege that Mott had obtained Miranda Hamilton's Ohio Direction (SNAP) card until November 14, 2018 and the PIN to use the card until November 15, 2018, almost one month after this text message. Accordingly, the text cannot be referring to that card.

{¶47} The state informed the trial court that this text and others were "cards from multiple people demonstrating this isn't a one-time accident or mistake." T. at 199.

However, nowhere in the record does the state cite to evidence where Mott ever in fact obtained the "girl card."

**{¶48}** More troubling is that the state is unable to point to any evidence in the record before this Court that Mott was referring to an illegal or improper act when he referred to "girl card." However, in *Huddleston v. United States,* the United States Supreme Court observed when a trial court reviews the record to find support of the "other acts" evidence,

> We emphasize that in assessing the sufficiency of the evidence under Rule 104(b), the trial court must consider all evidence presented to the jury. "[I]ndividual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it. The sum of an evidentiary presentation may well be greater than its constituent parts." *Bourjaily v. United States*, 483 U.S. 171, 179–180, 107 S.Ct. 2775, 2781, 97 L.Ed.2d 144 (1987).

485 U.S. 681, 690-691, 108 S.Ct. 1496, 99 L.Ed.2d 771(1988). In the case at bar, when combined with the information in other text messages the state admitted, the inference becomes more apparent that what Mott is referencing is a food stamp card.

### *November 3 and 4, 2018 text messages.*

**{¶49}** Next the state introduced the following text message,

> STATE: This text here, this is November 3rd. Again this is a number, not Miranda's, but it is someone's number. Does it have a name associated with it?
>
> BAKER: Donji.
>
> STATE: And is that a "Sent" one?

BAKER: Yes.

STATE: And what is the text of that sent message to Donji?

BAKER: "Let me know how much she spent off the card."

STATE:  And what would that appear to you as an investigator to indicate?

BAKER:  How much was spent on that particular card.

T. at 200-201.  The state continued,

STATE: November 4th at 7:50, is this another message to Donji?

BAKER: Yes.

STATE: Is it sent from the defendant?

BAKER: Yes.

STATE: What is the text of that message?

BAKER: "I was bout to go to Wal-Mart to get that video game, but wait on you.  Bring food card too."

STATE: So that 11/4 date would be within 2 weeks that the defendant was found with these two cards in his possession, too.  Is that right?

BAKER: Yes.

### November 8, 2018 text messages.

STATE: November 8th at 3:44, is this another text to Donji?

BAKER: Yes.

STATE: Sent from the defendant? Is it sent from the defendant's phone?

BAKER: Yes.

STATE: What's the text of that message?

BAKER: "Didn't want my babe hungry, and the stamp card is there too."

### *November 11, 2018 text messages.*

STATE: This number here, November 11, 2018, at 3:52, is that a number different than Miranda's as well?

BAKER: Yes.

STATE: And is it a "Sent" message?

BAKER: It is an "Incoming" message.

STATE: What is the text of that message?

BAKER: "I'm at Wal-Mart getting groceries.  My friend gave me her food card, so as soon as I get home I'll call you, okay?  Won't be too much longer."

STATE: So in addition to Miranda, is there discussion with two to three other people about using various food cards?

BAKER: Correct.

T. at 201-202.  Prior to the admission of the aforementioned texts, the trial court overruled defense counsel's objection, noting, "The state is entitled to bring the evidence out to show there is a lack of mistake in this matter as a course of conduct.  The defendant at this point in time was doing something that he is well aware that he was doing.  So the court is going to find that the probative value is much greater than any prejudicial value and the court is going to allow that."  (T. at 200). None of the participants to the text messages testified at trial. The state presented no response to the text from Mott.

{¶50} When combined with the previous text messages it is apparent that the state is seeking to use the text messages to negate Mott's "innocent intent." Since Mott had discussed getting the card, how much was left on the card, bring the card when you meet me and I left the food card there because I didn't want you to be hunger, the jury could reasonably find from looking at the text messages as a whole, rather than individually, Mott had used Ohio Direction (SNAP) cards in the past in a manner not authorized by law, thus tending to negate any innocent explanation for being in possession of Miranda Hamilton's card on November 15, 2018. This is a permissible purpose and those text messages were properly admitted.

### *July 3, 2018 text message.*

{¶51} The following text message from July 3, 2018 was also admitted,

STATE: What is the text of that?

BAKER: "I need some smoke. I got 10."

STALE: Is this Miranda's number again?

BAKER: Yes.

STATE: Is this a "Sent" message?

BAKER: Yes.

STATE: What did the defendant send to Miranda?

BAKER: "Smoke in."

T. at 203-204. This testimony was not objected to at trial. The record seems to suggest that the state presented this evidence to support their contention that individuals will exchange their Ohio Direction (SNAP) cards for drugs. [Appellee's brief at 6-7]. Miranda did not testify at trial. The state points to no evidence in the record that Miranda has ever

exchanged an Ohio Direction (SNAP) card for drugs. The state points to no evidence in the record that Mott received an Ohio Direction (SNAP) card from Miranda, or anyone else, in exchange for drugs. The text exchange concerning Miranda's Ohio Direction (SNAP) card clearly shows Mott did not solicit Miranda Hamilton to sell or exchange her Ohio Direction (SNAP) card; rather, Miranda Hamilton sent out a text to nearly ten people offering to exchange the card for *money*. In her text message Miranda Hamilton is asking for money because, "I ain't got no cigs and could use some *cash*." T. at 191-193. In addition, the text message concerning "smoke in" was sent in July 2018 some *four months before* Miranda Hamilton sent the text message offering to sell her Ohio Direction (SNAP) card for cash. T. 203-204.

{¶52} The danger of unfair prejudice is that the jury will see Mott as a drug dealer and therefore it is likely he committed the crime in the case at bar. The state failed to establish a permissible nonpropensity purpose for the admission of this text message. In other words this text message was not probative of a purpose other than to impugn Mott's character and was irrelevant to a material issue in the case. *Hartman,* ¶73.

### *Failure to give the jury a limiting instruction.*

{¶53} Mott next argues that the trial court committed plain error because it did not give the jury a limiting instruction concerning the other acts evidence.

{¶54} In *State v. Hartman,* the Ohio Supreme Court observed,

> The court must give a limiting instruction upon request. Evid.R. 105.
> But that does not mean the court should sua sponte issue such an
> instruction any time other-acts evidence is used. Depending on the nature
> of the other-acts evidence and the context in which it is used, defense

counsel may as a matter of strategy wish to avoid highlighting the evidence for the jury. *State v. Schaim*, 65 Ohio St.3d 51, 61, 600 N.E.2d 661 (1992), fn. 9 ("the decision not to request a limiting instruction is sometimes a tactical one, and we do not wish to impose a duty on the trial courts to read this instruction when it is not requested").

*Hartman,* 2020-Ohio-440, ¶67.    Because trial counsel did not request a limiting instruction, the trial court was not required to give the jury a limiting instruction concerning the other acts evidence.

### Unredacted video of traffic stop and CD of the entire contents of Motts cell phone.

{¶55} In the case at bar, the traffic stop by Sergeant Morrow was recorded in its entirety by his dashcam cruiser cam.(State's Exhibit 1).   On November 8, 2019, trial counsel filed a Motion in Limine to exclude the dashcam video of the traffic stop. (Docket Entry Number 35). The entire dashcam video of the traffic stop was not played to the jury. Rather, it appears from the record that the state played the video through Sergeant Morrow's approach to the vehicle. The CD was then fast-forwarded to show Officer Lalon presumably placing Ohio Direction Cards on the hood of Morrow's vehicle, Morrow testified regarding these two portions of the dashcam video. (T. at 169-173). While a Motion in Limine was filed to restrict jury view to the relevant portions of the dashcam video, it appears the entire, unredacted dashcam CD was provided to the jury. T. at 215; 260.

{¶56} According to Morrow's dashcam video, Morrow approached Mr. Mott, informed him of the brake light issue and requested Mr. Mott's license. Mott provided his license, said he lived on Adams and explained the vehicle was not his. Morrow then

ordered Mr. Mott out of the vehicle and patted him down. Morrow stated the car smelled like marijuana and Mott admitted smoking marijuana earlier that day in Michigan. Morrow asked a litany of questions, including where Mr. Mott was heading, where he was coming from, what he had done that day, and the nature of his relationship with the female passenger, Donjion Reese. (State's Exhibit 1). After placing Mr. Mott in his cruiser, Morrow asked the same questions of the passenger, Ms. Reese.

{¶57} Ms. Reese confirmed the two were coming from Mr. Mott's mother's home, had gone shopping that day, and had bought a coat. Morrow then requested backup due to supposed discrepancies between Mr. Mott and Ms. Reese's answers. In addition, Morrow stated Mott's car smelled "like raw weed" and he needed a place to put the passenger while searching the vehicle. (State's Exhibit 1).

{¶58} Because marijuana debris was found in the passenger seat during the vehicle search, Sergeant Morrow decided to search the passenger. The passenger removed a large number of oxycontin pills from her bra during the search of her person. Shortly thereafter, the voice of an unknown officer says, "I assume you're gonna try and hook the male driver," Sergeant Morrow responds, "Am I gonna try to what? Yeah, I'm gonna try to get the male driver. I gotta talk to him. I haven't said one word." (State's Exhibit 1). Although Morrow expressed concern that Mott might have discarded something in the cruiser, both Mr. Mott and the cruiser were searched and no drugs were found. However, Mott was charged with Aggravated Trafficking and Possession of Drugs in Wood County based upon the oxycontin pills found on the passenger, Donjion Reese.

{¶59} State's Exhibit 7 is the entire download of Mott's cellphone. T. at 182. The state used the Exhibit to admit several of the test messages referred to above. However,

the jury was given the disk containing the entire contents of the cell phone. T. 215; 260. Upon this Court's review, State's Exhibit 7 contains hundreds of text messages, as well as pictures and videos unrelated to the charges in  this case that potentially contain inadmissible other acts evidence.

**Conclusion.**

{¶60} Due to the errors in the admission of the other acts testimony relating to drugs, giving the unredacted exhibits the jury, the prosecutor's insinuation that Mott was exchanging drugs for food stamp cards, the jury was presented with evidence that Mott was the type of defendant who possessed and trafficked drugs and committed other unsubstantiated offenses, resulting in prejudice.   The evidence in the record cannot overcome these glaring errors.

{¶61} It can hardly be questioned that the jurors likely weighed in their analysis the fact that Mott was involved with drugs and other unsubstantiated offenses.  This is especially true where, as here, no instructions were requested or given to the jury concerning the purposes for which the other acts evidence may and may not be considered, and, further, the jury was not instructed that the state does not satisfy its burden of proof beyond a reasonable doubt by an inference that the defendant committed this crime because his past acts suggest a propensity to commit crimes. *See, State v. Hartman,* Oh.Sup.Ct. No. 2019-0184, 2020-Ohio-4440, 2020 WL 5637596 (Sept. 22, 2020), ¶70-71. Further, the entire exhibits rather than only the relevant an admitted portions of those exhibits were given to the jury to review during their deliberations.   The state increased the danger of unfair prejudice by highlighting the improper inferences during closing argument

{¶62} We conclude that the other-acts drug evidence, the unredacted traffic stop video and the entire contents of Motts cell phone introduced in this case was not admissible for any purpose under Evid.R. 404(B). Each of the purported rationales raised upon by the trial court either invited an improper character reference or was irrelevant to a material issue in the case. Further the jury instructions provided did not mitigate the prejudicial effect of the evidence. *Hartman*, ¶73.

{¶63} Accordingly, Motts First and Second Assignments of Error are sustained.

{¶64} In light of our disposition of Mott's Second Assignment of Error, we find Motts Third, Fourth and Fifth Assignments of Error to be moot.

{¶65} The judgment of the Richland County Court of Common pleas is reversed and this matter is remanded for further proceedings consistent with this opinion.


By Gwin, J.,

Hoffman, P.J., and

Baldwin, J., concur