[Cite as *State v. Ross*, 2024-Ohio-3117.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NOS. C-230508 |
| | | C-230509 |
| Plaintiff-Appellee, | : | TRIAL NOS. B-2006193 |
| | | B-2204564 |
| vs. | : | |
| | | |
| PERCY ROSS, | : | *O P I N I O N.* |
| | | |
| Defendant-Appellant. | : | |

Criminal Appeals From: Hamilton County Court of Common Pleas

Judgments Appealed From Are: Affirmed

Date of Judgment Entry on Appeal: August 16, 2024

*Melissa A. Powers*, Hamilton County Prosecuting Attorney, and *Judith Anton Lapp*, Assistant Prosecuting Attorney, for Plainitff-Appellee,

*Arenstein & Gallagher* and *William R. Gallagher*, for Defendant-Appellant.

**WINKLER, Judge.**

{¶1} Defendant-appellant Percy Ross was indicted for two counts of murder under R.C. 2903.02(A) and (B), with accompanying firearm specifications, one count of felonious assault under R.C. 2903.11(A)(2), also with accompanying firearm specifications, and one count of having weapons under a disability under R.C. 2923.13(A)(3). Ross elected to have a bench trial on the weapons-under-a-disability count. The trial court found him guilty, but continued the matter for sentencing. At a jury trial on the remaining three counts, Ross claimed that he acted in self-defense. That trial ended with a hung jury.

{¶2} Subsequently, he was indicted for one count of tampering with evidence under R.C. 2921.12(A)(1), with an accompanying firearm specification. The trial court consolidated the two cases for trial. After a second jury trial, Ross was found guilty of one count of murder, one count of felonious assault, and one count of tampering with evidence, and all of their accompanying specifications. The jury acquitted him on one of the murder counts. The trial court again found him guilty of the weapons-under-disability charge.

{¶3} The trial court merged the felonious assault count with the murder count, as well as some of the firearm specifications. It sentenced Ross to serve an aggregate sentence of 21 years to life in prison on the murder charge. It also sentenced him to 36 months' incarceration on the having-weapons-under-disability charge, and four years' imprisonment on the tampering-with-evidence charge, both to be served consecutively to the sentence on the murder charge. This appeal followed. We find no merit in Ross's five assignments of error, and we affirm his convictions.

## I.    Factual Background

{¶4}    The record shows that on November 22, 2020, at about 4:00 a.m., police received a 911 call about a shooting at a four-unit apartment building at 7815 New Bedford Avenue in Roselawn. Upon arrival, the responding officers found the body of Elias Tsibouris lying at the bottom of a set of stairs in front of the main entrance to the building.

### A. Cab Driver's Testimony

{¶5}    Cab driver Stanley Asberry made the 911 call. He testified that he picked up Tsibouris at about 3:00 a.m. in Roselawn. Tsibouris was a regular customer of the cab company, and Asberry stated that he was "a nice guy" and that he "liked him so much." Tsibouris asked Asberry to drive him a short distance to pick up his girlfriend, Carlee Otten, at 7815 New Bedford Avenue and then drive them to another location.

{¶6}    Upon arriving at that address, Asberry parked across the street from the building. Tsibouris said that his girlfriend would be coming out shortly. After waiting about 15 minutes, Tsibouris called her, and she said she was coming. When she did not, he walked to the front door of the building and knocked, calling out for her. Asberry said that Tsibouris did not seem angry or aggressive, just irritated that she had not come out of the building.

{¶7}    When his girlfriend did not respond, Tsibouris walked to the back of the building, while trying to reach her on the phone. Asberry remained seated in his cab. He had to look through the front passenger seat window, which was rolled down, to see the building's front door, which was situated about 25 feet up from the curb. The front lights of the building were on.

{¶8}    When Tsibouris came back to the front door, Asberry asked him what was taking so long. Tsibouris turned and looked at Asberry. He said that his girlfriend had called, and she was coming out. Then, Asberry saw the front door of the building

open, Tsibouris "turned around, and he was surprised, and pow." Asberry said that Tsibouris's hands were down, and he was only holding his cell phone, not any weapons. He added that there was "no conversation, no nothing." When the door opened, "there was a pow. . . . [H]e was not trying to get into the apartment. I never seen him grab the doorknob or anything. He knocked on the door a few times, that's all." Asberry added that was no time for any interaction between Tsibouris and the shooter.

{¶9} Tsibouris fell down, and the front door closed. Asberry saw a man run up the steps inside the building to go into the apartments on the top floor. He described the shooter as an older gentleman with close-cut, salt-and-pepper hair, who was a little taller than him.

{¶10} Asberry then drove about a quarter of a mile away and called the cab company. He was told not to get involved, but he stated that "I like this guy. I'm not going to go just leave him laying there like that." Afterwards, he was rattled and drove home. Later that morning, he met with homicide detectives.

### B. The Police Investigation

{¶11} Criminalist Jimmy Pham generated a diagram of the crime scene that showed blood stains going from the landing where Tsibouris had been shot and down the steps to where he was found lying in the front yard. He identified a 9 mm shell casing found underneath the bushes in the front yard. While casings from most firearms eject to the right, he said that there was no way to determine how the casing ended up there.

{¶12} Pham stated that no blood was found inside the doorway or in the common area of the building where the shooter had stood when he fired the gun. Pham documented a pool of blood on the landing outside the front door, several feet

from the threshold. He also documented blood spots going down each step from the landing, consistent with Tsibouris rolling or sliding down the steps after being shot.

{¶13} Detective Greg Gehring arrived at the scene shortly before 5:30 a.m. After he spoke with Asberry, residents of the building, and the landlord, the investigation became centered on apartment three. Although the apartment was leased to another individual, the landlord stated that a person she knew as "Pee Wee" was residing there. Pee Wee was later determined to be Ross. The police prepared a search warrant and brought in a SWAT team. A negotiator from the SWAT team contacted Ross, who returned to the scene. Ross agreed to speak to police at their office.

{¶14} Ross denied any involvement in the shooting. He told the detectives that he had been lying down when he heard someone banging on the door. He walked out into the hallway, and he saw a "guy he knew of" when he looked down the stairs. He walked back into his apartment to call 911 when he heard a gunshot. He said that a woman named Linda was with him in the apartment, and he and Linda left the apartment. The detectives determined that his story was all lies. There was no woman named Linda, and the person in the apartment with Ross was Otten. Detective Gehring stated that Ross was at their office a long time, a "matter of hours." During that time, Ross never mentioned that he acted in self-defense.

{¶15} Dr. Anne Laib, a forensic pathologist and deputy coroner with the Hamilton County Coroner's Office, performed an autopsy on Tsibouris. She determined that Tsibouris was 44 years old, was five feet eleven inches tall, and weighed 337 pounds. She testified that his cause of death was a gunshot wound to the head.

{¶16} Dr. Laib further testified that there was a muzzle imprint on Tsibouris's head, which meant that the murder weapon had been "pressed firmly and forcefully

5

against the skin" when it was fired. She found soot and gunpowder deep within the wound, which only happens when a gun is pressed against the skin. The bullet traveled through Tsibouris's right eye, the base of his skull, and through his brain. It exited through the upper left skull behind his left ear. Dr. Laib also found that the left sides of Tsibouris's arm, shoulder and leg were scraped and bruised, consistent with him falling on his left side.

{¶17} A toxicology report showed that Tsibouris had fentanyl and cocaine in his system at the time of his death. Dr. Laib testified that he was "acutely intoxicated," which means that the drugs were still in their "unbroken down form in the body." She further stated that at the time he was shot, he was under the influence of those drugs, but she clarified that she could not say how he metabolized those drugs or how they affected his behavior the night of the shooting.

### C. Ross's Testimony

{¶18} The State introduced Ross's testimony from the previous trial into evidence. Ross stated that he had gotten out of prison in August 2020, and that he was on postrelease control. The conditions of his postrelease control required him to stay away from hard drugs and guns. He lived in his nephew's apartment at 7815 New Bedford Avenue while his nephew was in prison. The landlord was his nephew's best friend and allowed Ross to perform various tasks in the building in lieu of rent.

{¶19} At some point prior to November 14, 2020, Carlee Otten moved in with Ross and spent most nights there. She was a drug addict, who used, among other things, crack, heroin, and fentanyl. Ross said that he knew that she used drugs in her room, but he allowed her to move in because he thought it was safer for her than being on the street.

{¶20} Ross also knew that Otten spent time with Tsibouris, and Otten told Ross that she had taken $3,800 from him. At one point, Ross drove Otten to see Tsibouris, and when he did not hear from her in several days, he became concerned. After Ross told Tsibouris that he would call the police if he did not hear from Otten, he received a call from her, asking him to pick her up. She told Ross that Tsibouris had "kept her hostage."

{¶21} At about 3:30 a.m. on November 14, 2020, Ross was asleep in his apartment when he heard "boom, boom," and a crash. Then he heard banging on his apartment door. When Ross looked through the peephole, he saw Tsibouris standing there. Otten was standing behind Ross. As he ran to the kitchen to get a butcher knife, Otten said, "Let me get him out of here." Ross opened the door to let her out, then slammed it shut, and locked it. Otten left with Tsibouris. Subsequently, Ross discovered Tsibouris had kicked in the Plexiglass window to the left of the door to the building and reached inside to open the door.

{¶22} After Ross told his nephew about that incident, he told Ross that he had a gun in a shoebox on a shelf in his bedroom. Ross retrieved the gun. He said that he had no confidence that the entryway door would keep someone from entering the building.

{¶23} Ross did not see or hear from Tsibouris again until the early morning hours of November 22, 2020. He said that he had been "smoking weed" all night, fell asleep, and awakened to the sound of someone banging on the front door of the apartment building. He looked out the window and saw a cab. He thought it might be for his downstairs neighbors in apartment two. When he asked Otten if she knew who it was, she said no.

{¶24} A few minutes later, Ross heard "boom, boom, boom, boom." He said the vibration shook the building. The pounding went on for about ten minutes. He

thought that he should see what was going on, so he "instinctively" grabbed the gun, although he knew he was violating the conditions of his postrelease control. As he walked down the stairs, he did not see anyone at the door, even though there were two windows on either side of the front door.

{¶25} Ross reached with his left hand to open the door, which swung out left to right, with the gun in his right hand. At that moment, he was shocked and scared to see Tsibouris. Ross asked Tsibouris, "What are you doing here?" Tsibouris asked, "Where is Carlee?" Ross remained inside the doorway because Tsibouris was blocking the entry. Ross told him, "Get out of here. Man, don't come in here." When he did not leave, Ross told him again, "Don't come in here." Tsibouris again asked for Otten. Ross testified that the more times he told Tsibouris to go away, the angrier he got.

{¶26} Tsibouris came toward Ross with his shoulder lowered like he was going to "swing at me, throw a punch or something and hit me." As Tsibouris came toward him, Ross moved back, angling away from him. Ross said that Tsibouris, who was younger and much larger than Ross, "was looking crazy." Ross thought there was no way he could beat Tsibouris. As Tsibouris came closer to him, Ross raised his right hand with the gun to shoot. When the gun went off, he and Tsibouris were so close to each other that they touched. Ross did not know if he pulled the trigger intentionally or accidentally. He said that "it just happened too fast."

{¶27} After the gunshot, Ross could not see Tsibouris. He stepped through the doorway and saw him lying at the bottom of the steps. He admitted that although he had said that Tsibouris was coming toward him, Tsibouris never made it to the threshold of the front door and fell backwards.

{¶28} Ross, who claimed that he had never shot anyone, panicked. He ran upstairs, changed his shoes, put on a black tee shirt and sweatshirt, and grabbed a jacket. He told Otten, "We got to get out of here." Otten stated that there was a warrant

for her arrest, so she went with him. He drove down Summit Road and got rid of the gun by throwing it out of his car into a wooded area. He said that even though Otten was with him, she did not see where he threw the gun.

### D. Otten's Testimony

{¶29} The defense presented Otten's testimony from the previous trial. She admitted that she was addicted to fentanyl, heroin, and cocaine at the time. She was in a relationship with Tsibouris, who was also an addict. Because they were homeless, they often stayed in Tsibouris's car, in hotels, or outside. Tsibouris's drug of choice was cocaine.

{¶30} In November 2022, Otten often stayed at the apartment where Ross was living. She had a sexual relationship with Ross, who supplied her with drugs. She admitted that she was scheming with both Tsibouris and Ross to get as many drugs from both of them as she could.

{¶31} The night before the shooting, Otten said she was going to leave some cocaine for Tsibouris in a grill in front of Ross's apartment, and he was going to leave some fentanyl for her in exchange. She led Tsibouris to believe that they were going to be paid a lot of money for the drugs that they would sell. But she put white power in the grill, and after Tsibouris retrieved it, he realized that he had been scammed.

{¶32} Tsibouris left the area but returned in a cab and waited outside for Otten. He texted her, "Cab getting off highway," and "Cab here." In the meantime, she had gone upstairs and had fallen asleep after using the fentanyl. Tsibouris texted her repeatedly and asked why she wasn't coming down. When he received no answer, he texted, "Plan B about to happen. We are out front; in 30 seconds I'm coming in." He walked to the front door of the building and began knocking loudly enough to wake her. She texted him, telling him to go away.

**{¶33}** Otten said that Ross woke up and went downstairs to see who was making all the noise. She texted Tsibouris and told him, "He's coming. Get off the fuckin door." Tsibouris responded, "BRING THE MONEY." She said that she was in the kitchen making toast when she heard Ross say, "Who is it?" and tell Tsibouris to leave. Then she heard a gunshot. Ross returned upstairs and told her that they needed to leave. He also told her that "he did not mean to do it." Otten said she left, because she was afraid of "being charged." She also told police that Ross had threatened her and her loved ones. When they left through the front door, she did not look at anything and did not notice Tsibouris's body.

## II. *Ineffective Assistance of Counsel*

**{¶34}** In his first assignment of error, Ross contends that he was denied the effective assistance of counsel. He argues that his counsel was ineffective for failing to object to and to seek redactions of Ross's prior testimony, which was inadmissible under Evid.R. 404(B) and 609(A)(2). This assignment of error is not well taken,

**{¶35}** A court will presume that a properly licensed attorney is competent, and the defendant bears the burden to show ineffective assistance of counsel. *State v. Hamblin*, 37 Ohio St.3d 153, 155-156 (1988); *State v. Hackney*, 2016-Ohio-4609, ¶ 36 (1st Dist.). To sustain a claim for ineffective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687, (1984); *Hackney* at ¶ 36.

**{¶36}** To establish that counsel's performance was deficient, the defendant must show that counsel's representation fell below an objective standard of reasonableness. *Strickland* at 687-688; *Hackney* at ¶ 37. Judicial scrutiny of counsel's performance must be highly deferential. The defendant must overcome the

10

presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Strickland* at 689; *Hackney* at ¶ 37. A defendant is not deprived of the effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic. *State v. Brown*, 38 Ohio St.3d 305, 319 (1988); *Hackney* at ¶ 37.

**{¶37}** To establish prejudice, a defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Strickland* at 694; *Hackney* at ¶ 38. Prejudice from defective representation sufficient to justify reversal of a conviction exists only where the result of the proceeding was unreliable or fundamentally unfair because of counsel's performance. *Lockhart v. Fretwell*, 506 U.S. 364, 369-370 (1993); *State v. Carter*, 72 Ohio St.3d 545, 558 (1995); *Hackney* at ¶ 38.

### A. Counsel's Failure to Object

**{¶38}** Ross argues that his counsel was ineffective for failing to object to testimony on cross-examination about Ross's 30-year-old convictions and his violations of the conditions of his postrelease control. First, we note that counsel's failure to make objections is not, by itself, enough to sustain a claim of ineffective assistance of counsel. *State v. Conway*, 2006-Ohio-791, ¶ 168; *Hackney*, 2016-Ohio-4609, at ¶ 39 (1st Dist.).

**{¶39}** Generally, the prosecution in a criminal case may not present evidence that the defendant has committed other crimes or acts independent of the crime for which the defendant is being tried to establish that the defendant acted in conformity with his bad character. Evid.R. 404(B); *State v. Thomas*, 2013-Ohio-5386, ¶ 20 (1st Dist.). But Evid.R. 404(B) provides that other bad acts are admissible to show "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of

mistake or accident." *State v. Shedrick*, 61 Ohio St.3d 331, 337 (1991); *Thomas* at ¶ 20.

{¶40} Because Evid.R. 404(B) codifies an exception to the general rule, it must be strictly construed against admissibility. *State v. Coleman*, 45 Ohio St.3d 298, 299 (1989); *Thomas* at ¶ 21. Nevertheless, the other acts need not be similar to the crime at issue. If the other acts tend to show by substantial proof any of the items enumerated in Evid.R. 404(B), evidence of the other acts is admissible. *Coleman* at 299-300; *Thomas* at ¶ 21.

{¶41} Evid.R. 609 governs impeachment of a witness's credibility through admission of a prior criminal conviction. *State v. French*, 2024-Ohio-1256, ¶ 34 (1st Dist.). Evid.R. 609(A)(2) provides,

> Notwithstanding Evid.R. 403(A), but subject to Evid.R. 403(B), evidence that the accused was convicted of a crime is admissible if the crime was punishable by death or imprisonment in excess of one year pursuant to the law under which the accused was convicted and if the court determines that the probative value of the evidence outweighs the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

Evid.R. 609(B) states,

> Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of conviction or of the release from confinement, or the termination of community control sanctions, post-release control, probation, parole, or judicial release imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the

conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

{¶42} The record shows that Ross's testimony was presented by defense counsel in the first trial. On direct examination, Ross's counsel began by having Ross acknowledge that he had lied to the police when he was questioned about the murder. Ross admitted that he had lied, but he said that he was ready to tell the truth at trial. Counsel asked if this was the first time Ross had ever been charged with a crime. Ross acknowledged that he had other convictions for drug-related offenses that had resulted in prison terms.

{¶43} Then, defense counsel asked him about his most recent time in prison, and Ross replied that he had been released in August 2020. He testified that he was subject to postrelease control. The conditions of postrelease control were that he could not have contact with the police under any circumstances, and that he could not be around hard drugs or guns. He acknowledged that he had violated those conditions.

{¶44} While still on direct examination, Ross asked if he could say something. He stated, "I'm 65 years old at the time. Man, I ain't never shot nobody. I ain't never killed nobody. I ain't never stabbed nobody. I ain't never cut nobody. I don't carry myself like that. I ain't never hurt nobody, I mean never in my life, my 65 years."

{¶45} On cross-examination, the state asked about his previous convictions, especially violent offenses. The state asked, "This is not the first time you've been convicted for a felony weapon conviction." Ross replied, "No." He added that he had been released from prison in 2020 for a crime that involved a gun. The prosecutor asked, "You've been convicted multiple times of assault on a police officer, isn't that correct?" Ross replied, "That was about 30 years ago." He also stated that he had pleaded guilty "just to get it over with."

**{¶46}** The State also asked him about the conditions of his postrelease control. Then the State asked him, "So we already know you've been out of prison for about three months, and you've already committed two crimes?" Ross replied, "Okay. Yes, I have. It's my fault." The State then asked him, "When you grabbed that gun, you walked down the stairs, you knew you were committing a crime?" He replied, "Yes, I did."

**{¶47}** In the previous trial, Ross was a defense witness, testifying on his own behalf. His previous testimony was presented by the State in this trial. Nevertheless, his trial strategy in both trials was to be candid about his previous convictions and other bad acts to enhance his credibility to the jury on his self-defense claim. He admitted that he lied to police because he knew he was on postrelease control, and he did not trust the police or understand that he could raise self-defense. In doing so, he opened the door to questions about his previous convictions.

**{¶48}** A defendant may introduce testimony, through himself or others, of a relevant character trait that would tend to prove he acted in conformity therewith on a particular occasion. Evid.R. 404(A)(1). By introducing that evidence, the defendant "opens the door" for the prosecution, which is then permitted to rebut or impeach this character evidence on cross-examination under Evid.R. 405(A). That cross-examination may include inquiry into relevant specific instances of conduct. *State v. Eldridge*, 2003-Ohio-7002, ¶ 41-43 (12th Dist.).

**{¶49}** Ross specifically put his character for peacefulness at issue through his voluntary statement that he had never shot, killed, stabbed or cut anyone. *See id*. at ¶ 41. Convictions over ten years old can be admissible under Evid.R. 609(B) if the "probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect." Arguably, the convictions for assaulting a police officer were relevant to Ross's claims that he was not violent, but we question

whether asking about 30-year-old convictions was proper. Nevertheless, the questions about those convictions were brief, and they were not unfairly prejudicial.

**{¶50}** Questionable trial strategies and tactics do not rise to the level of ineffective assistance of counsel. *State v. Mohamed*, 2017-Ohio-7468, ¶ 18. Simply because there was "another and better strategy available" did not mean that counsel provided ineffective assistance. *Id.* at ¶ 19, quoting *State v. Clayton*, 62 Ohio St.3d 42, 49 (1980). Consequently, we overrule Ross's first assignment of error.

### B. Counsel's Failure to Request a Limiting Instruction

**{¶51}** In his second assignment of error, Ross again contends that he was denied the effective assistance of counsel. He argues that defense counsel's failure to request a limiting instruction and final jury instruction regarding the limited purpose for which the jury could consider his prior convictions, prior inconsistent statements, and prior bad acts constituted ineffective assistance. This assignment of error is not well taken.

**{¶52}** The failure to request limiting instructions on the use of an offender's prior convictions does not, in and of itself, indicate ineffective assistance of counsel. *State v. Hester*, 2002-Ohio-6966, ¶ 15 (10th Dist.); *State v. Brown,* 2002-Ohio-5455, ¶ 17 (12th Dist.). Generally, the failure to request jury instructions is purely a matter of trial tactics and will not be disturbed on appeal. *State v. Herrington*, 2010-Ohio-6426, ¶ 11 (9th Dist.). "This is especially so in cases where the jury instruction at issue would have undermined or been inconsistent with the defense's theory of the case." *State v. Moore*, 2021-Ohio-54, ¶ 35 (9th Dist.).

**{¶53}** The theory of Ross's defense was that while he had made mistakes in the past and lied to police, once he took responsibility for his actions, he told the truth. He also asserted that he lied to the police because he knew he had violated the conditions

of his postrelease control, and he did not trust the police or know that he could have raised self-defense. A limiting instruction would be inconsistent with his defense because his counsel had brought up the prior convictions as a trial strategy.

**{¶54}** Ross has not overcome the presumption that his counsel's failure to request a limiting instruction was a matter of trial strategy. *See Mahomed*, 2017-Ohio-7468, at ¶ 25; *Hester* at ¶ 15; *Brown* at ¶ 16-17. Because Ross has not shown that his counsel's performance was deficient, we need not consider the issue of prejudice. Consequently, we overrule Ross's second assignment of error.

### III.     The Court's Failure to Sua Sponte Give a Limiting Instruction

**{¶55}** In his third assignment of error, Ross contends that the trial court committed plain error in failing to give limiting or final jury instructions sua sponte regarding the limited purpose for which the jury could consider the character evidence. He argues that the trial court's failure to do so deprived him of his right to due process and a fair trial. This assignment of error is not well taken.

**{¶56}** A court need not sua sponte give a limiting instruction every time other-acts evidence is presented. "Depending on the nature of the other-acts evidence and the context in which it is used, defense counsel may as a matter of strategy wish to avoid highlighting the evidence for the jury." *State v. Hartman*, 2020-Ohio-4440, ¶ 67. The decision not to request a limiting instruction "is sometimes a tactical one," and the Ohio Supreme Court has stated that it does not "wish to impose a duty on the trial courts to read this instruction when it is not requested." *State v. Schaim*, 65 Ohio St.3d 51, 61, fn. 9 (1992).

**{¶57}** Because trial counsel did not request a limiting instruction, the trial court was not required to give the jury a limiting instruction concerning the other-acts evidence. *See State v. Mott*, 2020-Ohio-4979, ¶ 54 (5th Dist.). Therefore, the court

did not err in failing to give a limiting instruction, much less commit plain error. We overrule Ross's third assignment of error.

### IV.    *Speedy Trial*

**{¶58}** In his fourth assignment of error, Ross contends that the trial court erred in denying his motion to dismiss the tampering-with-evidence indictment. He argues that that indictment violated his right to a speedy trial. This assignment of error is not well taken.

**{¶59}** Our review of the trial court's decision involves mixed questions of fact and law. *State v. Cheatham*, 2021-Ohio-2495, ¶ 8 (1st Dist.). We give due weight to the inferences drawn from the facts found by the trial court as long as they are supported by competent, credible evidence. We review the trial court's conclusions of law de novo to determine whether the facts satisfy the applicable legal standard. *State v. Gage*, 2018-Ohio-480, ¶ 5 (1st Dist.).

**{¶60}** Ohio has codified a defendant's right to a speedy trial in R.C. 2945.71. *Cheatham* at ¶ 11. Under R.C. 2945.71(C)(2), a person charged with a felony must be tried within 270 days from his arrest. In *State v. Adams*, 43 Ohio St.3d 67, 68 (1989), the Ohio Supreme Court held, "When new and additional facts arise from the same facts as did the original charge and the state knew of such facts at the time of the initial indictment, the time within which trial is to begin on the additional charge is subject to the same statutory limitations period that is applied to the original charge."

**{¶61}** The Supreme Court later distinguished *Adams* in *State v. Baker*, 78 Ohio St.3d 108 (1997). It held that the State, in issuing a second indictment against the defendant, was not subject to the speedy-trial time limits of the original indictment because the subsequent charges were based on new and additional facts that the State did not know at the time of the original indictment. *Id.* at syllabus. It stated,

"Additional crimes based on different facts should not be considered as arising from the same sequence of events for the purposes of speedy-trial computation." *Id.* at 111.

{¶62} "[A] case by case analysis is necessary when applying the new-and-additional-evidence standard elucidated by *Baker*." *State v. Kinsey*, 2019-Ohio-4248, ¶ 22 (1st Dist.). In this case, on December 1, 2020, a grand jury indicted Ross for two counts of murder, felonious assault, and having weapons under a disability. The first trial ended with a hung jury on the two murder counts and the felonious-assault count. On September 21, 2022, the state indicted Ross on one count of tampering with evidence. The trial court consolidated the two indictments for trial. Following several continuances, most of which were at Ross's request, the trial began on August 15, 2023, well over 270 days from the original indictment.

{¶63} In his motion to dismiss for lack of a speedy trial, Ross argued that the State knew or should have known that he had disposed of the gun he used to shoot Tsibouris. First, the police did not find a gun at the scene of the shooting. Second, police spoke to Otten on November 24, 2020, and she stated that Ross had told her that the gun was gone.

{¶64} Even though the State knew the gun was missing, it had no knowledge of what exactly had happened to it. During his interview with the police, Ross denied that he was involved in the shooting. Although Otten testified that Ross had told her the gun was gone, she did not know any further details. She stated, "Yes, someone got rid of it. He got rid of it, or whatever, but it wasn't going to be found." That statement alone was not sufficient to support an indictment for tampering with evidence. A mere suspicion based on some evidence is not enough to say that the second indictment was based on information known to the State at the time of the original indictment. *See Kinsey*, 2019-Ohio-4248, at ¶ 33 (1st Dist.).

18

{¶65}  It was not until Ross testified in the first trial that the State learned that Ross had thrown the gun into a wooded area near the scene.  Consequently, the State was not subject to the speedy-trial time limits of the original indictment because the second indictment was based on new and additional facts that the State did not know at the time of the original indictment.  Therefore, we overrule Ross's fourth assignment of error.

### V.  Self-Defense

{¶66}  In his fifth assignment of error, Ross contends that the jury verdicts finding him guilty of counts two and three, felonious assault and murder, were against the manifest weight of the evidence.  He argues that the state failed to prove that he was not acting in self-defense.  This assignment of error is not well taken.

{¶67}  As a preliminary matter, the jury found him guilty of felonious assault in count two of the indictment.  But the trial court merged that count with count three, one of murder charges.  A conviction requires a finding of guilt and sentence.  *State v. Whittle*, 2024-Ohio-1023, ¶ 38 (1st Dist.).  So even though the jury found him guilty of felonious assault, there was no conviction because the trial court merged it with the murder count.  *See State v. Johnson*, 2018-Ohio-4131, ¶ 53 (1st Dist.).  Therefore, we address this assignment of error only in relation to the murder conviction.

{¶68}  Generally, the elements of self-defense in cases of deadly force are: (1) the defendant did not create the situation giving rise to the affray; (2) the defendant had a bona fide belief that he was in imminent danger of death or great bodily harm; and (3) the defendant did not have a duty to retreat or avoid danger.  *State v. French*, 2024-Ohio-1256, ¶ 25 (1st Dist.); *State v. Smith*, 2020-Ohio-4976, ¶ 48 (1st Dist.).  The elements of self-defense are cumulative, and a defendant's claim of self-defense fails

if any one of the elements is not present. *State v. Ridley,* 2022-Ohio-2561, ¶ 15 (1st Dist.); *Smith* at ¶ 48.

{¶69} In 2018, the Ohio legislature modified R.C. 2901.05 to change the treatment for the use of force in self-defense and to add a new burden-shifting provision. *State v. Parrish*, 2020-Ohio-4807, ¶ 7 (1st Dist.); *Ridley* at ¶ 16. The statute was amended again in 2021, but that amendment did not substantively change the applicable provisions. We apply the statute in effect at the time of the offense. *See Ridley* at ¶ 16.

{¶70} Under the applicable former version of R.C. 2905.01(B)(1), the defendant had the initial burden of production to present evidence that "tends to support" a claim of self-defense. *Ridley* at ¶ 17; *State v. Williams*, 2020-Ohio-5245, ¶ 7 (1st Dist.). While the "tends to support" language was a "new feature" in the 2018 amendment of the statute, that phrase did not change the defendant's burden of production. *Williams* at ¶ 8; *Parrish* at ¶ 13-14. The defendant must produce evidence that, when viewed in the light most favorable to the defendant, is sufficient to create a reasonable doubt as to guilt. *Williams* at ¶ 9; *Parrish* at ¶ 14, both citing *State v. Melchior*, 56 Ohio St.2d 15 (1978), paragraph one of the syllabus. "The question of credibility is not to be considered." *Ridley* at ¶ 17, quoting *State v. Sullivan*, 2020-Ohio-1439, ¶ 45 (11th Dist.).

{¶71} The burden of going forward with evidence is met when evidence, if true, "would raise a question in the minds of reasonable jurors concerning the existence of such issue." *State v. Ralls,* 2022-Ohio-2110, ¶ 7 (1st Dist.). To meet the burden of production, the defendant must produce evidence that "when viewed in a light most favorable to the defendant is sufficient to cast a reasonable doubt as to guilt." *Ridley*, 2022-Ohio-2561, at ¶ 18 (1st Dist.); *Parrish* at ¶ 14.

**{¶72}** Once the defendant met this burden of production, former R.C. 2901.05(B)(2) shifted the burden of persuasion to the prosecution. As a result, the prosecution does not assume the burden of persuasion until the defendant first meets his or her burden of production. *Ralls* at ¶ 7; *Williams*, 2020-Ohio-5245, at ¶ 7 (1st Dist.). The prosecution must produce evidence to disprove one of the elements of self-defense beyond a reasonable doubt. *Ridley* at ¶ 19; *Williams* at ¶ 7. We review de novo whether the trial court applied the proper legal standard and whether evidence of self-defense was sufficient to shift the burden to the prosecution. *Williams* at ¶ 5.

**{¶73}** The State only needs to disprove one of the elements of self-defense beyond a reasonable doubt. *Smith*, 2020-Ohio-4976, at ¶ 51 (1st Dist.). Therefore, in evaluating a manifest-weight challenge involving self-defense, we must review the entire record, consider the credibility of the witnesses, and determine whether the trier of fact lost its way and created a manifest miscarriage of justice with respect to its finding that the State disproved at least one of the elements of self-defense beyond a reasonable doubt. *French*, 2024-Ohio-1256, at ¶ 255 (1st Dist.); *Smith* at ¶ 51. Ross presented evidence that tended to show that he acted in self-defense. So, the burden of persuasion fell to the State.

**{¶74}** The State proved beyond a reasonable doubt that Ross did not have a bona fide belief of imminent danger. This element has both objective and subjective tests. *Smith* at ¶ 56. A defendant's belief that he was in immediate danger of death or great bodily harm must be objectively reasonable, and the defendant must have an honest belief that he was in danger. *State v. Warth*, 2023-Ohio-3641, ¶ 43 (1st Dist.); *Smith* at ¶ 56. The state may disprove self-defense by demonstrating that the defendant's belief was not objectively reasonable or that he did not have an honest subjective belief that he faced imminent death or great bodily harm. *Warth* at ¶ 43; *Smith* at ¶ 56.

**{¶75}** Ross argues that he was 65 years old and weighed 160 pounds at the time of the shooting. Tsibouris, on the other hand, was 20 years younger and about 150 pounds heavier, and had a substantial amount of drugs in his system. Ross had seen the damage that Tsibouris had done to the window by the apartment door to obtain access only a week before.

**{¶76}** Ross testified that Tsibouris was agitated. He ignored Ross's repeated orders to leave the property. Ross stated that Tsibouris dropped his shoulder and moved toward Ross, as if to attack him. Tsibouris kept yelling angrily for Otten and would not take no for an answer. Ross feared for his safety as he felt that he could not fend off Tsibouris, and therefore, he had no alternative but to raise the gun toward Tsibouris. Afterward, Ross had no memory of pulling the trigger. He said it all happened fast.

**{¶77}** Ross's argument requires his testimony to be believed. The State presented Asberry's testimony, which was directly opposed to Ross's testimony. Asberry testified that Tsibouris had been waiting about 15 minutes for Otten to come down. When he walked to the front door, he did not appear angry or aggressive. Asberry then asked him what was taking so long, and Tsibouris looked at him and said that Otten was coming down. Immediately afterward, the door opened, Tsibouris turned around and he was shot.

**{¶78}** Asberry stated that Tsibouris's arms were down by his side when he was shot and that no conversation with anyone had occurred before he was shot. "There was no time for that," he said. He also stated that Tsibouris had not grabbed the doorknob or tried to get into the building. Additionally, Otten had testified that Ross went downstairs to see who was knocking, she heard Ross say, "Who is it?" and then she heard a gunshot.

22

**{¶79}** Further, Dr. Laib, the coroner, testified that there was a muzzle imprint on Tsibouris's forehead that meant that the murder weapon had been pressed firmly and forcefully against the skin when it was fired. She found soot and gunpower deep within the wound, dispelling Ross's claim that he shot Tsibouris after he lunged at him.

**{¶80}** Even though Tsibouris was bigger and younger than Ross, he was unarmed. He was not there to find Ross, but instead he wished to speak to Otten. After the shooting, Ross fled the scene, and when he spoke to police, he repeatedly lied to them, undercutting his claim that he feared for his life. Even if Ross had a subjective belief that he was in imminent danger, a reasonable trier of fact could have determined that that belief was not objectively reasonable.

**{¶81}** Viewing the evidence in a light most favorable to the prosecution, the jury could have reasonably found that the State disproved the imminent-belief-of-harm element beyond a reasonable doubt. *See Warth*, 2023-Ohio-3641, at ¶ 50 (1st Dist.); *Smith*, 2020-Ohio-4976, at ¶ 62 (1st Dist.). The jury could have believed the State's evidence and disbelieved Ross's testimony. Matters as to the credibility of evidence are for the trier of fact to decide. *French*, 2024-Ohio-1256, at ¶ 29 (1st Dist.). Consequently, we overrule Ross's fifth assignment of error.

### *VI. Summary*

**{¶82}** In sum, we hold that Ross was not denied the effective assistance of counsel, the trial court did not err in failing to give a limiting instruction on the character evidence, Ross's speedy-trial rights were not violated, and the state disproved one of the elements of his self-defense claim. Consequently, we overrule his five assignments of error and affirm the trial court's judgments.

Judgments affirmed.

**BERGERON, P.J.,** and **CROUSE, J.,** concur.

Please note:

The court has recorded its own entry this date.