[Cite as *State v. Grubbs*, 2025-Ohio-2756.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| STATE OF OHIO, | : | APPEAL NO. C-240165 |
| | | TRIAL NO. B-2106544-A |
| Plaintiff-Appellee, | : | |
| vs. | : | |
| JACK GRUBBS, | : | *JUDGMENT ENTRY* |
| Defendant-Appellant. | : | |

This cause was heard upon the appeal, the record, the briefs, and arguments.

Upon defendant-appellant's application for reconsideration, the judgment of the trial court is affirmed for the reasons set forth in the Opinion filed this date.

Further, the court holds that there were reasonable grounds for this appeal, allows no penalty, and orders that costs are taxed under App.R. 24.

The court further orders that 1) a copy of this Judgment with a copy of the Opinion attached constitutes the mandate, and 2) the mandate be sent to the trial court for execution under App.R. 27.

**To the clerk:**
**Enter upon the journal of the court on 8/6/2025 per order of the court.**

**By:**_____
　　　　**Administrative Judge**

[Cite as *State v. Grubbs*, 2025-Ohio-2756.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO


|                          |   |                        |            |
|--------------------------|---|------------------------|------------|
| STATE OF OHIO,           | : | APPEAL NO.             | C-240165   |
|                          |   | TRIAL NO.              | B-2106544-A |
| Plaintiff-Appellee,      | : |                        |            |
|                          |   |                        |            |
| vs.                      | : |                        |            |
|                          |   | *OPINION ON*           |            |
| JACK GRUBBS,             | : | *RECONSIDERATION*      |            |
|                          |   |                        |            |
| Defendant-Appellant.     | : |                        |            |


Criminal Appeal From: Hamilton County Court of Common Pleas

Judgment Appealed From Is: Affirmed

Date of Judgment Entry on Appeal: August 6, 2025


*Connie M. Pillich*, Hamilton County Prosecuting Attorney, and *John D. Hill, Jr.*, Assistant Prosecuting Attorney, for Plaintiff-Appellee,

*Arenstein & Gallagher* and *William R. Gallagher*, for Defendant-Appellant.

**MOORE, Judge.**

**{¶1}** Defendant-appellant Jack Grubbs appeals his conviction for murder, arguing his conviction was based on inadmissible Evid.R. 404(B) evidence, due to the ineffective assistance of counsel and prosecutorial misconduct, and contrary to the manifest weight of the evidence. We entered an opinion in this case on April 18, 2025, *State v. Grubbs*, 2025-Ohio-1384 (1st Dist.). Grubbs filed an application for reconsideration, which we granted. We here reconsider and substitute this opinion for the one entered on April 18, 2025.

**{¶2}** We hold that any error by the trial court in admitting other-acts evidence, and any deficiency in counsel's performance, were not prejudicial to Grubbs. We further hold that no prosecutorial misconduct occurred, and Grubbs's conviction was not contrary to the manifest weight of the evidence. For these reasons, we affirm the trial court's judgment.

## I. Factual and Procedural History

### The Night of the Shooting

**{¶3}** Prior to the night of December 21, 2021, when Tyler Lee was killed, Grubbs and Lee had been "boys," i.e., friends. In fact, until early December, Lee lived with Grubbs at a house located at 4337 Cappel Avenue in the Price Hill neighborhood of Cincinnati, Ohio. Malachi Joy, Grubbs's codefendant in this matter, also lived there.

**{¶4}** On the night of the shooting, both Grubbs and Lee arrived at the Cappel Avenue address at approximately 6:30 p.m. Lee arrived in a black Dodge Charger driven by his girlfriend, Paige Cox. Grubbs noticed the car as he saw it park in front of his neighbor's house next door. The windows of the car were tinted, so Grubbs could not see the passengers. Grubbs exited from his own vehicle and walked toward the house.

{¶5} Once he reached the porch of his house, Grubbs turned and saw that the person that had gotten out of the Charger was approaching him. Grubbs responded by drawing his gun and firing. Lee was hit with multiple gunshots and his body landed in front of a tree near the porch.

{¶6} Cox was sitting in the Charger looking at her phone and listening to music when she heard the gunshots. After hearing the shots, she got out of the car and went to where Lee's body lay. Grubbs fled the scene; Lee died there.

{¶7} Grubbs fled to his father's house in nearby Covington, Kentucky. He threw the gun in a sewer and cut his long, unkempt hair, which he had become known for. The police eventually found and arrested Grubbs. The investigation, trial, and conviction underlying this appeal followed.

The Investigation

{¶8} At the scene of the shooting, Cincinnati Police ("CPD") officers found multiple shell casings near the front porch steps of Grubbs's house. Lee's body remained by the tree in the front yard. Officers found marijuana and digital scales, as well as ammunition, stray gun magazines, and several additional firearms belonging to either Joy or Grubbs. Joy had hidden these items in a red backpack in the basement of the house. A surgical mask was found on the front lawn, away from the porch and closer to the street. Officers later found Lee's revolver after impounding the Charger as part of their investigation. Cox later admitted to taking the gun and hiding it in the car after she saw that Lee had been shot.

Grubbs is Arrested and Charged

{¶9} Two days after the shooting, Grubbs was arrested in Kenton County, Kentucky. He was charged with one count of murder with specifications in violation of R.C. 2903.02(A), murder with specifications in violation of R.C. 2903.02(B), felonious

assault with specifications in violation of R.C. 2903.11(A)(2), and involuntary manslaughter with specifications in violation of R.C. 2903.04(A). The involuntary-manslaughter charge and its accompanying specifications were dismissed by the State prior to trial.

The Trial

*The Neighbor's Testimony*

{¶10} Grubbs's next-door neighbor testified that on the night of the shooting, she heard gunshots and Cox screaming for help and saw a car speed by her house. The neighbor also saw Cox sitting against the tree in Grubbs's yard and holding Lee's body across her lap.

*Paige Cox's Testimony*

{¶11} Cox testified that Joy and Lee communicated some time that day via social media and planned for Lee to come to the Cappel Avenue address to buy marijuana from Joy.

{¶12} According to Cox, Lee was at a party with Grubbs and Joy on December 19th and he spent the night at their house that evening following the party. She testified that when he left for the party, Lee was wearing an "all-orange" hooded sweatshirt with "words that had black on it." Cox also testified that Lee was wearing the same clothing when she picked him up from Grubbs's house the next morning. Cox was shown a screenshot of a picture she posted on Facebook on December 19th, which showed Lee wearing the same sweatshirt. Cox testified that Lee was wearing the same sweatshirt when Grubbs shot him.

{¶13} Cox testified that Lee's face was not covered when he got out of the car the night he was killed. She also stated that Joy told him to bring a gun for protection when he came to the house, and that Lee had a revolver either in his sweatshirt or his

5

pants pocket.

**{¶14}** Before hearing the gunshots, Cox was looking at her phone and listening to music, so she did not see the shooting. After hearing the gunshots, she heard either Joy or Grubbs say, "Not my boy, Tyler." Cox described getting out of the car and seeing Lee's body lying "in front of the tree with his feet still on the walkway" leading to Grubbs's house. She also saw Grubbs "[try] to run into his house" then turn around and run past her and flee the scene in his car.

**{¶15}** Cox saw Lee's revolver lying on the ground next to his body. Cox took the gun and hid it in the Charger under the front-passenger seat. Cox conceded that she did not reveal that she hid Lee's gun when she was initially interviewed by the police. She admitted in her second interview to concealing the gun. Cox explained that she did not expect Lee to die that night and took the gun out of fear that he would get into trouble.

*Malachi Joy's Testimony*

**{¶16}** Joy testified that Grubbs knew that Lee was coming over that day. He stated that Lee was still living with them on December 21st and that he was just staying with Cox "for a couple of days." Joy recognized the outfit Lee wore in the screenshot of the picture of Lee from Cox's Facebook page, including the distinctive orange sweatshirt. Joy also testified that Grubbs had long hair for about a year and a half prior to the shooting. Joy also explained that the house on Cappel Avenue where he and Grubbs lived had not recently been burglarized, however, a friend who stayed at the house one night had taken Grubbs's guns.

**{¶17}** Joy stayed with Lee and Cox until the ambulance arrived, then he went into the house to hide the guns and marijuana that belonged either to him or Grubbs.

*Expert Testimony*

{¶18} Lee's revolver was analyzed by the Hamilton County crime lab. The analysis revealed that although Lee's DNA was found on the gun's handle his blood was not.

{¶19} Dr. Laib, an expert in forensic pathology, testified that a bullet had struck Lee's right hand and perforated multiple blood vessels, which was consistent with the EMTs decision to apply a tourniquet to the arm to try to stop the bleeding. The cuff on the right sleeve of Lee's sweatshirt had holes that matched the wounds on his right hand, indicating that the cuff was "down over the main part and palm of the hand at the time the bullet went through it." The wound on the hand also showed that Lee was either shot through an object or at a distance as no gunpowder particles were embedded around the wound. She explained her conclusion that Lee was shot from one-and-a-half to three feet away.

{¶20} Dr. Laib explained that the injury to Lee's hand caused much more damage than the shot to his hip because the bullet hit blood vessels and caused an "extensive amount of hemorrhaging" versus the nonfatal passing of the bullet through the muscle and lodging in Lee's hip bone. She testified that Lee could have "bled to death . . . just from the injury to his hand."

{¶21} Civilian criminalist Amanda Perkins testified that the Charger Cox drove that night was parked right in front of the next-door neighbor's house. There was a streetlight in front of Grubbs's house and one behind the Charger. After recovering Lee's gun from the Charger, Perkins saw blood on the barrel and cylinder of Lee's gun. A surgical mask was found away from the body.

*Officer Horning's Testimony*

{¶22} CPD officer Kimberly Horning testified based on her experience, not as an expert. She swabbed Lee's gun handle to "hopefully identify who would be holding

the weapon." Lee's gun had "a lot of blood smears on it." Lee's blood was found along the gun barrel along the cylinder, and there was a small area of blood near the trigger guard. However, no blood was found on the handle. As to whether Lee was holding the gun when he was shot, Horning explained how the blood that was on the gun was "transferred," versus the blood "spatter" that would be expected if Lee were holding the gun. She further testified that there was no damage to the handle of the gun.

*Detective Steve Holstrom's Testimony*

**{¶23}** Erlanger, Kentucky, police Detective Steve Holstrom testified that an Erlanger resident reported seeing a gun in a nearby sewer while looking for her cell phone. Officers recovered the gun and sent it to the Cincinnati Crime Intelligence Gun Unit. Detective Holstrom determined the gun belonged to Grubbs.

*Detective Greg Gehring's Testimony*

**{¶24}** CPD Detective Gehring testified to conducting a "cellphone dump" on Grubbs's phone. It showed that Grubbs had downloaded Cox's picture of Lee wearing the orange hooded sweatshirt on December 19th—the same date as when Cox posted the picture on Facebook. Gehring also testified that while "parts of Price Hill" are dangerous, Cappel Avenue is not.

**{¶25}** Audio of the calls that Grubbs made to his grandmother, uncle, and brother from the Kenton County jail were played at trial. Grubbs was heard telling his family that he had his back turned and he had the screen door open when a person ran "up behind" him, and he did not know it was Lee. There was no mention of him seeing Lee holding a gun.

*Jack Grubbs's Testimony*

**{¶26}** Grubbs described his experience with gun violence, stating that he began carrying a firearm in 2019 out of fear after his friend was killed. He testified he

8

was "on edge" because someone had broken into the Cappel Avenue house the week before Lee was killed and stole firearms, so he had a "bad feeling."

**{¶27}** Grubbs testified that the night Lee was shot, he was returning home from making a marijuana sale nearby. Grubbs testified that when he turned onto his street another car was coming "kind of head-on" in his direction and then parked behind his neighbor's car. He stated that he pulled into his driveway, and he could not see because the Charger's headlights were on, it was dark outside, and the all-black car and tinted windows prevented him from seeing the passengers inside. He denied seeing the Charger before that night or that he knew that Lee was coming over that day.

**{¶28}** Grubbs testified that he saw a person get out of the Charger wearing the hood up on his sweatshirt and "appeared to be wearing a mask." Grubbs testified that the person that exited from the car said, "What should I do?" Grubbs stated that he did not recognize the voice and that he took the statement as "kind of, as a threat, maybe." In response, he explained he turned and said, "Watch out, man" as if to say, "leave me alone."

**{¶29}** Grubbs explained that he did not call for help because he was thinking of getting into his house where he felt safe. Grubbs testified that he ran onto his porch and when he turned around, the person ran "at him," and was "right up on him" pulling a gun with his right hand, so Grubbs shot him.

**{¶30}** Grubbs denied recognizing the orange and black sweatshirt Lee was wearing. He testified that he did not know it was Lee until after he shot him when Lee identified himself saying, "Ah. It's Tyler, bro. You just shot me." Grubbs testified that he went down the porch steps and tried to help Lee get up.

**{¶31}** Grubbs stated that he left the scene and drove to his father's house at

Joy's urging and because, with Lee's revolver lying next to his body, Grubbs was afraid that Cox would use it to shoot him in retaliation for shooting Lee.

{¶32} Grubbs testified that he cut his hair because he knew he was going to jail even though he shot Lee in self-defense, and that he was trying to hide not because he was avoiding the police, but because he was seeking defense counsel.

{¶33} At trial, the State highlighted Grubbs's failure to mention in both phone calls that Lee had a gun.

{¶34} On cross-examination, Grubbs denied making a video brandishing a firearm, prompting the State to show Grubbs a still shot of a video from Grubbs's Facebook account. Grubbs identified himself and Joy "[h]olding firearms," but declined to recite the caption on the picture, which stated, "Say you my n**** I'ma [sic] be your killer." Instead, Grubbs stated only that the caption was paraphrasing a song by the rapper Kodak Black. Over defense counsel's objection, the court admitted the still shot, finding the State was using it for impeachment and its prejudicial value did not outweigh its probative value.

{¶35} Grubbs described himself as an entrepreneur who sold shoes, designer clothing, and "a little bit of weed here and there." Grubbs also admitted to selling guns, although he claimed it wasn't normal for him to do so. The State introduced photos of a gun that Grubbs once offered for sale or trade. Grubbs conceded the gun in the photographs was the same gun used to kill Lee. The exhibits were admitted with no objection.

The Verdict

{¶36} The jury found Grubbs guilty of both murder counts, felonious assault, and all accompanying specifications. The trial court merged the second count of murder and the count of felonious assault with the first count of murder, and

sentenced Grubbs to 15 years to life. The court merged the specifications in Counts 2 and 3 with the specifications in Count 1 and sentenced Grubbs to three years, to be served consecutively to his sentence for murder, for an indefinite aggregate prison term of 18 years to life. The involuntary manslaughter charge was dismissed prior to trial.

## II.    Analysis

{¶37} Grubbs argues that his conviction was based on impermissible Evid.R. 404(B) evidence. He further argues that he was prejudiced by the ineffective assistance of counsel for counsel's failure to object to other-acts evidence and erroneously stating that Grubbs had a burden to prove self-defense. Grubbs also asserts he was prejudiced by prosecutorial misconduct. Specifically, Grubbs claims he was prejudiced by the State's comments calling him a liar and its claim that Lee was not holding a gun when he was shot. Finally, Grubbs argues that his conviction is contrary to the manifest weight of the evidence.

### A.  Evid.R. 404

{¶38} In his first and second assignments of error, Grubbs argues that the admission of the Facebook photo and videos of him holding a gun, and evidence that Grubbs possessed other weapons and trafficked in marijuana and Xanax, were improper Evid.R. 404(B) evidence that prejudiced him. Grubbs makes a general argument under the first, second, and third assignments of error—that the evidence "played on the jurors' emotions and invoked their negative feelings about young, armed men who sell drugs in our community" and painted him as a "gun-toting drug dealer."

Notice of Intent to Use Evid.R. 404(B) Evidence

{¶39} As an initial matter, Grubbs argues that the State failed to file a notice

of intent to use Evid.R. 404(B) evidence. However, he did not raise this objection at trial. Therefore, the issue is reviewed for plain error. *See State v. Long*, 53 Ohio St.2d 91 (1978), paragraph one of the syllabus.

**{¶40}** Evid.R. 404(B) requires the proponent of other-acts evidence to provide reasonable notice of its use in advance of trial. However, the rule requiring notice "should not be construed to exclude otherwise relevant and admissible evidence solely because of a lack of notice, absent a showing of bad faith." *State v. Binks*, 2018-Ohio-1570, ¶ 48 (12th Dist.).

**{¶41}** Because the lack of notice was not raised in the trial court and the record is devoid of any evidence of bad faith, the lack of notice cannot be the basis to exclude any admissible evidence. *See id.* Accordingly, the trial court did not err by allowing the State to introduce the other-acts evidence.

<u>Admissibility of Other-Acts Evidence</u>

**{¶42}** The admissibility of other-acts evidence pursuant to Evid.R. 404(B) is a question of law. *State v. Graham*, 2020-Ohio-6700, ¶ 72, citing *State v. Hartman*, 2020-Ohio-4440, ¶ 22. Evid.R. 404 contemplates acts that may or may not be similar to the crime at issue. *State v. Morris*, 2012-Ohio-2407, ¶ 13. Evid.R. 404(B) precludes admitting improper character evidence relating to "past bad acts to prove action in conformity therewith, which facilitates a conviction based on prior conduct rather than the evidence at hand." *State v. McDaniel*, 2021-Ohio-724, ¶ 15 (1st Dist.), quoting *State v. O'Connell*, 2020-Ohio-1369, ¶ 1 (1st Dist.).

**{¶43}** A trial court has discretion to allow other-acts evidence that is admissible for a permissible purpose, "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *McDaniel* at ¶ 15; *see Hartman* at ¶ 22, citing *State v. Williams*, 2012-Ohio-5695, ¶ 17. Another

consideration permitting the admission of certain other-acts evidence is whether the other acts "form part of the immediate background of the alleged act which forms the foundation of the crime charged in the indictment" and are "inextricably related" to the crime. *Id.*, quoting *State v. Curry*, 43 Ohio St.2d 66, 73 (1975).

*The Still Shot of the Facebook Video*

**{¶44}** We review Grubbs's objection to the still shot of the Facebook video using a three-step framework: (1) the evidence must be relevant to the particular purpose for which it is offered, Evid.R. 401; (2) the other acts must be offered for a legitimate purpose and not to show propensity to criminal conduct, Evid.R. 404(B); and (3) the danger of unfair prejudice must not substantially outweigh the probative value of that evidence, Evid.R. 403. *McDaniel* at ¶ 17; *see Graham* at ¶ 72, citing *Williams* at ¶ 20. We review these three prongs under a mixed standard of review; the first two pose legal questions, which we review de novo, and the third constitutes a judgment call which we review for an abuse of discretion. *McDaniel* at ¶ 17.

**{¶45}** Evid.R. 401 defines relevant evidence as:

[E]vidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

"It is almost always true that propensity evidence will have some relevance." *Hartman*, 2020-Ohio-4440, at ¶ 25. The relevance inquiry does not ask whether the other acts ultimately render the defendant's guilt more or less likely. *Id.* at ¶ 26. Instead, the inquiry considers whether the evidence is relevant to the particular purpose for which it is offered. *Id.* The question is whether the other-acts evidence is "so related to the crime charged in time or circumstances that evidence of the other acts is significantly useful in showing the defendant's intent in connection with the crime charged." *Id.* at

¶ 58, quoting 1 *Wharton's Criminal Evidence* at § 4:31 (15th Ed. 2019).

**{¶46}** In *State v. Thomas*, 2017-Ohio-8011, the Ohio Supreme Court warned that other-weapons evidence—i.e., irrelevant evidence of weapons unrelated to the charges—falls within the scope of Evid.R. 404(B). *State v. Gatewood*, 2021-Ohio-3325, ¶ 31 (1st Dist.). Therefore, evidence of dangerous weapons, even though found in the defendant's possession, must be excluded when they are not relevant to the crimes charged and lead only to improper inferences about the defendant's character. *Id.*, citing *Thomas* at ¶ 36.

**{¶47}** However, where other-acts evidence is offered to show a defendant's motive for lying, it is admissible. *State v. McKinney*, 2002-Ohio-3194, ¶ 18 (1st Dist.).

**{¶48}** Grubbs contends the Facebook still was not relevant to the charges contained in the indictment. The State counters that the still was offered for impeachment purposes, specifically, to show that Grubbs was not truthful in his testimony that he only carried firearms for protection.

**{¶49}** The still shows Joy and Grubbs wearing ski masks, and each holding multiple firearms. The evidence was, therefore, permissible for impeachment to show that Grubbs was not being truthful when he claimed he only carried firearms for protection. The still showed that Grubbs not only carried firearms for protection but also made videos brandishing them.

**{¶50}** While the still was admissible for purposes of impeachment, that is not the end of the analysis. The evidence must also be tested for undue prejudice under Evid.R. 403(A), which provides:

> Although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury.

14

**{¶51}** Here, in addition to showing Grubbs posing with multiple firearms, the still bore a caption paraphrasing a rap song lyric that read, "Say you my n**** I'ma [sic] be your killer."

**{¶52}** Grubbs argues that in addition to the Facebook still being impermissible other-acts evidence, it should be barred because it is unduly prejudicial. We agree.

**{¶53}** The still not only shows Grubbs holding multiple handguns and an AR-15-style assault rifle but also shows Joy holding multiple guns and includes a reference to an incendiary racial slur. Together, the image of the AR-15 military style weapon, the reference to one of the most offensive words in the English language,[1] and the suggestion of violent intent included in the caption creates a potential for unfair prejudice that substantially outweighs any probative value this evidence might otherwise have.

**{¶54}** The trial court stated the State's initial purpose in introducing the video and still shot was to impeach Grubbs's testimony. It is within the trial court's discretion to determine if the still shot's prejudicial effect was outweighed by its probative value. *State v. Johnson*, 2018-Ohio-4131, ¶ 36 (1st Dist.). A trial court abuses its discretion when it acts unreasonably, arbitrarily, or unconscionably in determining the evidentiary issue at hand. *State v. O'Connell*, 2020-Ohio-1369, ¶ 14 (1st Dist.). An appellate court will not disturb the trial court's decision to admit or exclude evidence absent an abuse of discretion and a showing that the accused has suffered material prejudice. *Id.*, citing *State v. Martin*, 19 Ohio St.3d 122, 129 (1985).

---

[1]Grubbs, incorrectly asserted during oral argument that the jury heard the slur in its pure, unadulterated form. The record, however, shows that what the jury saw in the still was "n****" (sic). This, however, is a distinction without a difference, as it was clear from even the edited version of the word that it referenced "probably the most offensive word in English." *See Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 580 (Kavanaugh, J., concurring) (citing *Random House Webster's College Dictionary* 894 (2d Rev.Ed. 2000).

**{¶55}** Here, the trial court abused its discretion in admitting the still shot bearing the caption. Therefore, we agree with Grubbs's argument that the Facebook still was unduly prejudicial and should not have been introduced. However, as explained below, this error proves harmless and does not justify reversing Grubbs's conviction.

*Harmless-Error Analysis*

**{¶56}** Having found the admission of the Facebook still was in error, we must decide if the error was harmless to determine if reversal is warranted. *See State v. Geary*, 2016-Ohio-7001, ¶ 11 (1st Dist.); Crim.R. 52(A) ("Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded."). Harmless-error review requires (1) that the defendant be prejudiced by the improper admission of the evidence, (2) that the appellate court believes the error was not harmless beyond a reasonable doubt, and (3) upon excising the improper evidence, a determination whether the remaining evidence overwhelmingly supports the defendant's guilt. *O'Connell* at ¶ 31; *see State v. Morris*, 2014-Ohio-5052, ¶ 27-29.

**{¶57}** The State met its burden to show that Grubbs was not prejudiced by the improper admission of the Facebook still. *See id.* at ¶ 23; *see also State v. Perry*, 2004-Ohio-297, ¶ 15. Even if the still is excised, there remained overwhelming evidence of Grubbs's guilt. As set forth in more detail below, evidence of Grubbs's guilt included not only expert testimony refuting his claim of self-defense, but also evidence that he fled the scene, hid the gun, and cut his trademark long hair. Therefore, we hold that the trial court's admission of the still was harmless error.

**{¶58}** Accordingly, we overrule Grubbs's first assignment of error.

*Evidence of Marijuana, Xanax, and Other Guns*

**{¶59}** In his second assignment of error, Grubbs argues that the trial court

committed plain error and violated his due-process rights by admitting improper Evid.R. 404(B) evidence, specifically that Grubbs possessed other weapons and sold marijuana and Xanax. Grubbs argues the admission of the evidence was not harmless and there was no overwhelming evidence of guilt independent of the evidence of drug sales and gun possession.

**{¶60}** As an initial matter, Grubbs did not object to admission of the photographs of the gun he used to kill Lee, the photos of marijuana or other guns, or Joy's testimony regarding Xanax. Therefore, the admission of this evidence is subject to a plain-error review. *Johnson*, 2018-Ohio-4131, at ¶ 29 (1st Dist.). Plain error does not exist unless it can be said that but for the error, the outcome of the trial would clearly have been otherwise. *State v. Terry*, 2024-Ohio-2876, ¶ 36 (1st Dist.).

**{¶61}** Grubbs conceded that the photographs of the guns from his cell phones, which he posted on social media, showed him holding the gun used to kill Lee. The gun had been found by Erlanger, Kentucky, police in a sewer near Grubbs's father's house. As the gun tied Grubbs to Lee's shooting, the photographic and physical evidence was properly admitted.

**{¶62}** The evidence of drugs and other guns was initially introduced during Joy's testimony to establish why Lee had come to Grubbs's house—to purchase marijuana and possibly Xanax. The evidence was also used to show Grubbs's illicit drug activities and that Joy, Grubbs, and Lee each carried guns.

**{¶63}** Evidence of guns other than the one Grubbs used to shoot Lee, and the one Joy used to shoot out of the window after hearing the gunshots outside, and drugs that were introduced during the State's case-in-chief were not relevant to the crimes Grubbs was charged with. However, even if this evidence was excised, the evidence of Grubbs's guilt was overwhelming.

**{¶64}** We overrule his second assignment of error.

## B. *Ineffective assistance of counsel*

### *Other-Acts Evidence*

**{¶65}** In Grubbs's third assignment of error, he argues that counsel's failure to object to inadmissible Evid.R. 404(B) evidence that he possessed other weapons and trafficked in marijuana and Xanax constituted ineffective assistance of counsel and prejudiced his defense. He contends his counsel was ineffective for failing to object to other-acts evidence that he possessed other guns, had no training in handling guns, had no legal right to possess guns, and sold marijuana and Xanax. As with the first and second assignments of error, Grubbs argues that he was prejudiced by being painted as an "armed drug dealer." Alternatively, he argues that the evidence was irrelevant.

**{¶66}** First, counsel's failure to make objections is not, by itself, enough to sustain a claim of ineffective assistance of counsel. *State v. Ross*, 2024-Ohio-3117, ¶ 3 (1st Dist.). A court will presume that a properly licensed attorney is competent, and the defendant bears the burden to show ineffective assistance of counsel. *Id.* at ¶ 35. To sustain a claim for ineffective assistance of counsel, the defendant must demonstrate that counsel's performance was deficient, and that the deficient performance prejudiced the defense. *Id.*, citing *Strickland v. Washington*, 466 U.S. 668 (1984).

**{¶67}** To establish that counsel's performance was deficient, the defendant must show counsel's representation fell below an objective standard of reasonableness. *Id.* at ¶ 36, citing *Strickland* at 687-688. Judicial scrutiny of counsel's performance must be highly deferential. *Id.* The defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Id.*, citing *Strickland* at 689. A defendant is not deprived of the

effective assistance of counsel when counsel chooses, for strategic reasons, not to pursue every possible trial tactic. *Id.*, citing *State v. Brown*, 38 Ohio St.3d 305, 319 (1988).

**{¶68}** To establish prejudice, a defendant must show that there is a reasonable probability that but for counsel's unprofessional errors, the result of the proceeding would have been different. *Id.* at ¶ 37, citing *Strickland* at 694. Prejudice from defective representation that is sufficient to justify reversal of a conviction exists only where the result of the proceeding was unreliable or fundamentally unfair because of counsel's performance. *Id.*, citing *Lockhart v. Fretwell*, 506 U.S. 364, 369-370 (1993).

**{¶69}** Grubbs suggests the trial court should have sua spont*e* instructed the jury to exclude or disregard the evidence of the other guns and drugs found in his home. However, a court is under no such obligation every time other-acts evidence is presented. *Ross*, 2024-Ohio-3117, at ¶ 56 (1st Dist.). Because counsel's decision not to request a limiting instruction "is sometimes a tactical one," the Ohio Supreme Court has stated that it does not "wish to impose a duty on the trial courts to read this instruction when it is not requested." *Id.*, quoting *State v. Schaim*, 65 Ohio St.3d 51, 61, fn. 9 (1992).

**{¶70}** As explained above, Grubbs's general claim that he was unduly prejudiced by trial counsel's failure to object to the admission of other-acts testimony and hearsay evidence is not substantiated by the record. Grubbs fails to show that there was a reasonable probability that the outcome of his trial would have been different had counsel objected. Further, Grubbs fails to show that counsel's failure to object to the evidence was not a part of counsel's trial strategy. *See Ross* at ¶ 56, quoting *Hartman*, 2020-Ohio-4440, at ¶ 67 ("Depending on the nature of the other-acts evidence and the context in which it is used, defense counsel may as a matter of

strategy wish to avoid highlighting the evidence for the jury.").

**{¶71}** Therefore, Grubb's third assignment of error is overruled.

*Self-defense*

**{¶72}** In his fourth assignment of error, Grubbs argues that his counsel was ineffective because he placed the burden of proof of self-defense on him, and that a defendant does not have to show that he did not give rise to the affray and had a bona fide belief of death or great bodily harm.

**{¶73}** At oral argument, Grubbs asserted for the first time that defense counsel's misstatement of the burden of proof for self-defense was per se ineffective assistance of counsel. Not only was this argument improperly raised on appeal, but it is also meritless.

**{¶74}** Ineffective assistance of counsel per se refers to situations where counsel's conduct is so egregious that counsel was not functioning as the "counsel" that the Sixth Amendment guarantees, without needing to prove specific prejudice to the defendant. *See, e.g., Ludwig v. United States*, 162 F.3d 456 (6th Cir. 1998) (An attorney's failure to file a notice of appeal, despite the wishes of the defendant, amounts to ineffective assistance of counsel per se, regardless of the merits of the appeal.); *United States v. Peak*, 992 F.2d 39 (4th Cir. 1993) (An attorney's failure to file a notice of appeal is per se ineffective and there is no requirement that the defendant establish prejudice—that is, the defendant need not establish that the appeal would raise meritorious grounds.). Other examples of per se ineffective assistance of counsel regard complete failure of representation and conflict of interest. *See Cope v. United States*, 385 Fed.Appx. 531 (6th Cir. 2010) (failure to investigate a plausible alibi); *Moss v. Hofbaur*, 286 F.3d 851 (6th Cir. 2002) (failure to conduct any meaningful adversarial challenge, including failure to have any defense theory

whatsoever, cross-examine more than half of the prosecution's witnesses, object to any evidence, put on defense witnesses, make a closing argument, or put on mitigation evidence).

**{¶75}** In asserting the affirmative defense of self-defense, a defendant has the initial burden of producing legally sufficient evidence that his use of force was in self-defense. *State v. Mitchell*, 2023-Ohio-2604, ¶ 12 (1st Dist.). To establish self-defense in the use of deadly force, this court has previously held that a defendant must show that:

> (1) the defendant was not at fault in creating the situation giving rise to the affray; (2) the defendant had a bona fide belief that [he or] she was in imminent danger of death or great bodily harm and that [his or] her only means of escape from such a danger was in the use of such force, and (3) the defendant did not violate any duty to retreat or avoid the danger.

*McDonald*, 2023-Ohio-1987, ¶ 17 (1st Dist.), quoting *Ohio v. Wilson*, 2022-Ohio-3801, ¶ 10.

**{¶76}** The State then bears the burden of persuasion to *disprove* at least one of the elements of self-defense (or defense of another) beyond a reasonable doubt. (Emphasis added.) *Wilson* at ¶ 10.

**{¶77}** Defense counsel initially stated in his closing argument that the State had to prove beyond a reasonable doubt that Grubbs was at fault for the situation, did not have reasonable grounds to fear death or great bodily harm, or that he "did not have an honest belief, even if mistaken" that his use of deadly force was reasonable. Counsel stated that Grubbs had to show "he was not at fault in creating the situation that led [him] to be afraid, and he had a bona fide belief that he was in imminent

21

danger of death or great bodily harm, and his only way to escape was by using force. That's it. There's no duty to retreat any longer in Ohio."

**{¶78}** It is the trial court's duty, as it did here, to instruct the jury on self-defense. *See State v. Messenger,* 2022-Ohio-4562, ¶ 26 ("At the close of [defendant's] jury trial, the trial court provided the jury with an instruction regarding self-defense, which means that the trial court concluded that [defendant] put forward sufficient evidence that he was acting in self-defense when he shot and killed [the victim]."). Therefore, while the explanation by trial counsel in closing may have been unnecessary, it was not a deficient performance, nor did it prejudice Grubbs. Counsel did not misstate the law as the initial burden does fall on a defendant to show by a preponderance of the evidence that he or she acted in self-defense. Regardless, and more importantly, Grubbs has not shown that, but for counsel's statements, the outcome of his trial would have been different. As Grubbs fails to show prejudice, we overrule his third assignment of error.

*Duty to retreat*

**{¶79}** Grubbs also argues that counsel was ineffective by failing to object to the following exchange:

> Q. At that particular moment when this alleged person was running up on you, was it your thought that you needed to kill that person to neutralize the threat?
>
> A. No, not at all.
>
> Q. What was your thought process?
>
> A. My first thought was flight, when I tried running away.
>
> Q. Now, you said "flight." You're right by the door of your house.
>
> A. Yes, I was. That's why I tried running into my house.

Q. Okay, so why didn't you just go in the house?

{¶80} R.C. 2901.09(C) is not an absolute prohibition on introducing evidence involving the possibility of retreat. *State v. Warth*, 2023-Ohio-3641, ¶ 31 (1st Dist.). Rather, the statute only prohibits factfinders from considering evidence involving the possibility of retreat to determine whether the defendant's belief that force was necessary was reasonable. *Id.* In cross-examining Grubbs about the reasonableness of his fear in this instance, the State elicited testimony regarding whether Grubbs could have continued into his home as he was standing on his porch. Therefore, whether it was a failure or choice not to object, it did not fall below the objective standard of reasonableness. As with his third assignment of error, Grubbs fails to show that there was a reasonable probability that the outcome of his trial would have been different had counsel objected.

{¶81} Grubbs's fourth assignment of error is overruled.

### C. *The State's comments do not amount to prosecutorial misconduct.*

{¶82} In Grubbs's fifth assignment of error, he argues that the State made improper remarks during trial and closing arguments that constituted prejudicial conduct sufficient to require reversal of his conviction. He first asserts that the State's premise that Lee was first shot in his hand was a misrepresentation of Dr. Laib's testimony because she could not identify in what order Lee sustained the bullet wounds.

{¶83} In determining whether prosecutorial misconduct has occurred, the test is whether (1) the prosecutor's remarks were improper, and, if so, (2) "whether they prejudicially affected the accused's substantial rights." *State v. Howard*, 2014-Ohio-655, ¶ 31 (1st Dist.), quoting *State v. Jones*, 2012-Ohio-5677, ¶ 200. Although prosecutors may not state their personal beliefs regarding guilt and credibility, they

may characterize a witness as a liar, or a claim as a lie, if the evidence reasonably supports that characterization. *State v. Jones*, 2007-Ohio-5458, ¶ 39 (1st Dist.).

**{¶84}** Grubbs concedes the trial court instructed the jury that closing arguments are not evidence but argues the State's "improper insinuations and assertions of personal knowledge" amounted to "flagrant misconduct" which needed to be rectified with "more definitive guidance."

**{¶85}** Grubbs's contention is problematic because the record and the State's responsive brief is devoid of any indication that it argued that Lee was first shot in his hand. The verbiage Grubbs cites in the transcript does not suggest that the State tried to persuade the jury that Lee was first shot in his hand. Instead, the record shows that the State's questions and arguments were based on Dr. Laib's expert testimony, which concluded that Lee was not holding his gun when he was shot.

**{¶86}** Next, Grubbs argues that the State calling him a liar on the record and stating in closing that it did not believe Lee was wielding his gun when Grubbs shot him expressed personal opinions regarding the validity of evidence during closing arguments.

**{¶87}** The testimony Grubbs refers to regards his statement that Lee was wearing a mask. The following exchange took place at trial regarding the location of the surgical mask and where it was found in relation to Lee's body:

Q. Well, you just told us that it was right next to him, and it clearly wasn't from this crime scene diagram. So you weren't telling the truth, were you?

A. I don't know how the mask got there. He was wearing a mask, though.

Q. But you just told us it was right next to him.

. . .

A. Yes, I did say that.

Q. So you weren't telling the truth.

A. I thought it was next to him.

Q. But you weren't telling the truth, were you?

A. No, I was. I have no reason to lie to you, ma' am.

Q. Well, you've been lying here all day. You just lied about that.

**{¶88}** The State asked these questions based on Grubbs's inconsistent testimony. There is no prosecutorial misconduct where the State cross-examined based on a reasonable characterization of the evidence and on Grubbs's testimony.

**{¶89}** The same can be said for the State's comment in closing that it did not believe Lee's gun was "out," and that instead, it fell out of Lee's pocket. This contention was also based on a reasonable characterization of the evidence, specifically Dr. Laib's expert testimony that Lee was not holding the gun when Grubbs shot him.

**{¶90}** Finally, Grubbs accuses the State of "cherry-pick[ing]" evidence in its closing regarding Grubbs's assertions of why he feared for his life. Grubbs's testimony was that he saw a person get out of the car and say, "What should I do?" As testimony is evidence, the State's comments as reflected in Ohio law that "words alone do not justify using deadly force" were not improper or a mischaracterization of the evidence. This is particularly true where the State has the burden of persuasion to show that Grubbs did not act in self-defense. Finally, the court instructed the jury that closing arguments are not evidence. Accordingly, the prosecutor's comments were not improper, and Grubbs's substantial rights were not prejudiced.

**{¶91}** Grubbs's fifth assignment of error is overruled.

## D. *Grubbs's conviction was not against the manifest weight of the evidence.*

**{¶92}** In his sixth assignment of error, Grubbs argues that his conviction was not supported by the weight of the evidence. Grubbs contends his actions were based on his "mistaken, but reasonable, belief an armed person was coming toward him intending to do him serious bodily harm." He asserts the only evidence presented against his self-defense claim was his actions following the shooting, which failed to prove beyond a reasonable doubt that he was not acting in self-defense. Grubbs further asserts the evidence the jury based his conviction on was impermissible Evid.R. 404(B) evidence introduced to show his "propensity to commit crime and his reckless use of firearms," and misstatements of the expert testimony regarding whether Lee pulled his gun before Grubbs shot him. Grubbs argues that "at best," the evidence shows that he acted "recklessly" which is not an element of murder or felony murder.

**{¶93}** When faced with a manifest-weight-of-the-evidence challenge, we must consider whether the State "carried its burden of persuasion" before the trial court. *State v. Gibson*, 2023-Ohio-1640, ¶ 8, quoting *Messenger*, 2022-Ohio-4562, at ¶ 26; *see State v. Martin*, 2022-Ohio-4175, ¶ 26. Unlike the evidence on an issue, the burden of persuasion represents a party's duty to convince the factfinder to view the facts in his or her favor. *Gibson* at ¶ 8, citing *Messenger* at ¶ 17. Therefore, to conclude that the factfinder's adjudication of conflicting evidence ran counter to the manifest weight of the evidence—which we reserve for only the most exceptional circumstances—we must find that the factfinder disregarded or overlooked compelling evidence that weighed against conviction. *Id.*, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387-388 (1997). We accordingly sit as a "thirteenth juror" in this respect. *Id.*

**{¶94}** As stated earlier, to establish self-defense, Grubbs had to meet his initial

26

burden to produce evidence that he was not at fault, that he had a reasonable belief of imminent danger of which the only means of escape was the use of force, and that he had no duty to retreat. *See McDonald*, 2023-Ohio-1987, at ¶ 17 (1st Dist.). The reference in R.C. 2901.05(B)(1) to "evidence presented that tends to support" self-defense indicates that the defendant's burden of production is not a heavy one and that it might even be satisfied through the State's evidence. *Messenger* at ¶ 21. The State must then disprove at least one of the elements of self-defense beyond a reasonable doubt. *Wilson*, 2022-Ohio-3801, at ¶ 10.

{¶95} R.C. 2901.09(B) is also a factor, which provides, "a person has no duty to retreat before using force in self-defense. . . if that person is in a place in which the person lawfully has a right to be." *State v. Warth*, 2023-Ohio-3641, ¶ 30 (1st Dist.). A trier of fact cannot consider the possibility of retreat in a claim of self-defense *if* the defendant "*reasonably* believed that the force was necessary to prevent injury, loss, or risk to life or safety." (Emphasis added.) *Id.*; R.C. 2901.09(C). Therefore, although Grubbs had a right to be on his property, his use of deadly force instead of going into his home must be based on a reasonable fear that he was facing death or serious bodily injury.

*The jury was entitled to believe Grubbs's justification for using deadly force was unreasonable.*

{¶96} A jury is in the best position to judge the credibility of the witnesses. *State v. Hall*, 2021-Ohio-3121, ¶ 44 (1st Dist.). The jury was entitled to weigh the evidence, consider the motivations of the witnesses, and choose to believe all, part, or none of the testimony offered. *Id.* When conflicting evidence is presented at trial, a conviction is not against the manifest weight of the evidence simply because the trier of fact believed the prosecution testimony. *McDaniel*, 2021-Ohio-724, at ¶ 25

(1st Dist.).

**{¶97}** The only evidence offered to support Grubbs's self-defense claim was his own testimony. Grubbs maintained that he was on edge due to the previous burglary and theft of guns from his home. Joy, however, testified that instead of a burglary, a friend who had been invited to the house took the guns. In addition, Grubbs's claim of being in fear was further refuted by Detective Gehring's and Carla Triplett's testimony that Cappel Avenue was in an area of Price Hill not generally known to be dangerous.

**{¶98}** The State also refuted Grubbs's self-defense claim by introducing the recording of Grubbs's initial account to his brother and uncle during a call from the Kenton County jail. This initial account did not include any reference to Lee having a gun. Grubbs also initially told his brother that he had the screen door open before turning and opening fire.

**{¶99}** The State's evidence suggested that Grubbs should have recognized Lee as (1) Grubbs's property and the property next door where Cox's car was parked were illuminated by streetlights, and neighboring houses were decorated with Christmas lights, (2) the shooting occurred around 6:30 p.m. and it was not yet fully dark outside, (3) Grubbs saw Lee wearing the same distinctive orange and black sweatshirt he wore two days prior when he went to a party with Grubbs, (4) Grubbs downloaded a picture of Lee wearing the sweatshirt three different times the night they went to the party, and (5) the two had previously been roommates and had been friends for years.

**{¶100}** The State's expert testimony reflected that Lee could not have been holding his gun when he was shot because (1) there was no blood on Lee's gun handle, (2) blood from the wound Lee sustained in his right hand would have caused blood spatter on the handle, and (3) the fact that the bullet went through Lee's hand

28

indicated the handle on his gun would have been damaged had Lee been holding it. The forensic evidence showed that Lee bled profusely due to multiple gunshot wounds, including the wound to his right hand, which alone could have resulted in Lee bleeding to death.

{¶101} Grubbs contends in his merit brief that "[t]he only evidence that possibly could have been construed against [his] claim of self-defense were his actions following the shooting." He cites Judge Bergeron's concurrence in *State v. Echols*, 2023-Ohio-2206 (1st Dist.) (Bergeron, J., concurring), arguing that flight does not create a presumption of guilt. The concurrence in *Echols*, however, was not focused on flight; rather, it centered on witness intimidation and the citations in support of the analysis were merely referenced regarding flight to get away from police or to avoid prosecution in limited circumstances where the person was innocent.

{¶102} Ultimately, it is the jury's prerogative to decide credibility and weigh the evidence presented on both sides. *See Hall*, 2021-Ohio-3121, ¶ 45 (1st Dist.). The jury was entitled to disbelieve Grubbs's testimony and instead believe that his fleeing to Covington, Kentucky, immediately after shooting Lee, throwing the gun into the sewer, and cutting his hair were all indications of guilt.

{¶103} The issue at bar does not regard whether Grubbs's killing Lee was an accident or reckless. The issue comes down to whether Grubbs's belief that Lee posed an imminent threat of serious bodily harm or death was reasonable. The jury chose to believe that it was not. The record is devoid of evidence that weighs heavily against the conviction. This is not "the exceptional case in which the evidence weighs heavily against the conviction." *Id.* There is nothing in the record to suggest that the integrity of the trial was tainted or that the jury clearly lost its way and created a manifest injustice. *See McDaniel*, 2021-Ohio-724, at ¶ 25 (1st Dist.).

**{¶104}** Grubbs's sixth assignment of error is overruled.

### III.    Conclusion

**{¶105}** For the foregoing reasons, we affirm the trial court's judgment.

Judgment affirmed.

**ZAYAS, P.J.,** and **BOCK, J.,** concur.

Please note:

The court has recorded its entry on the date of the release of this opinion.